1
2
3
4
5

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

6
7
8

PROJECT VERITAS,

                    Plaintiff,

9

    v.

No 2:21-cv-1326
**COMPLAINT**

10
11

THE LELAND STANFORD JUNIOR
UNIVERSITY and THE UNIVERSITY OF
WASHINGTON,

12
13

                    Defendants.

14      Plaintiff Project Veritas, by and through its attorneys, brings the following Complaint

15  against Defendants the Leland Stanford Junior University and the University of Washington, and

16  in support of its Complaint, avers as follows:

17                      SUMMARY OF THE ACTION

18      1.      This defamation action arises out of the publication of a false and defamatory blog

19  post by a newly-formed group calling itself the "Election Integrity Partnership" ("EIP"), a joint

20  undertaking by employees and agents of the Leland Stanford Junior University ("Stanford") and

21  the University of Washington.

22      2.      On September 29, 2020, EIP published on its website a "Rapid Response" blog post

23
24  (hereinafter, the "Blog Post") titled, *Project Veritas #Ballotharvesting Amplification.*[1]  The Blog

25
26  ---
27  [1] Isabella Garcia-Camargo, Alex Stamos, & Elena Cryst et al., *Project Veritas #BallotHarvesting Amplification*, Election Integrity P'ship (Sept. 29, 2020), https://www.eipartnership.net/rapid-response/project-veritas-ballotharvesting.

Post took aim at a recent bombshell investigative report produced by Project Veritas, an independent, not-for-profit journalism organization dedicated to exposing illegality and corruption in public and private institutions.  The Project Veritas investigative report (hereinafter, the "Video Report") exposed illegal voting practices taking place in support of Democrat candidates in the Somali-American community of Minneapolis, Minnesota.

3.      Despite the fact that the Veritas Video Report featured clear evidence of illegal activity—including incriminating videos posted to social media by a Democrat campaign worker bragging about his unlawful "harvesting" of absentee ballots, and on-camera interviews with knowledgeable community sources alleging a widespread practice of exchanging cash for absentee ballots by both identified and anonymized sources—the EIP blog post claimed that the Video Report "made several falsifiable claims" that were "without any factual support."  The EIP Blog Post further claimed that the Veritas Video Report was based on "misleading or inaccurate information," that it was "a form of election disinformation," and that it was part of a "disinformation campaign" to intentionally spread knowingly false reports of voter fraud in advance of the 2020 presidential election.

4.      These completely false claims about Veritas' journalism were not the product of the EIP's mistake or confusion.  Despite its name, Stanford and the University of Washington's "Election Integrity Partnership" is not dedicated to ensuring the integrity of elections or exposing voter fraud.  Rather, from its inception, the EIP's entire purpose was to support Democrat candidates and politicians by seeking to silence conservative voices and by claiming to the public that there is no such thing as voting fraud or irregularities—and that any evidence of such is merely malicious propaganda spread by the political right.  ***Indeed, the EIP's agenda is so pronounced that since its founding, it has never once labeled anything said by a Democrat politician as***

_**misinformation or disinformation**_.

5.      Faced with Project Veritas' well-sourced journalistic investigation that provided clear audio-visual evidence of unlawful voting practices taking place in a Democrat stronghold, supported by on-the-record and on-camera interviews by sources who are well-regarded in the Minneapolis Somali-American community, the EIP leapt into action to try and discredit the Veritas Video Report by any means necessary, and to convince those who might be concerned about the actions depicted in the Video Report that Veritas' journalism was nothing more than "disinformation"—information intentionally falsified to mislead the public.

6.      To do so, the Stanford and the University of Washington employees and agents who authored the Blog Post knew that they would need a bigger microphone than the newly-created EIP website.  So, they secretly coordinated with The New York Times, which shared the EIP's political leanings and desire to assure voters that Republican concerns about the integrity of elections were mere propaganda.  Working in tandem, The Times and the EIP arranged to have a Times news story trumpeting the defamatory Blog Post published mere minutes after the Blog Post first went online.

7.      The Blog Post served The Times' purpose of giving it a pretext to use its international reach to try and attack and discredit Project Veritas, and the arrangement also benefited the EIP Blog Post authors by giving their false claims about Project Veritas far greater reach than they otherwise would have had.  Thus, The Times' republication and amplification of the EIP's false and defamatory statements about Veritas was not only foreseeable, but specifically intended.

8.      Ironically, while the EIP accused Project Veritas of spreading "election disinformation" and being part of an "elite disinformation campaign," it was actually these

academics and their compatriots at The New York Times who engaged in a secret "elite disinformation campaign" as part of a coordinated effort to support the Democrat narrative that voter fraud is nonexistent in America, and that anyone who raises concerns about election integrity is necessarily spreading false propaganda and should be silenced.

9.      Project Veritas brings this action to vindicate its rights under civil law, to restore its reputation as an institution devoted to groundbreaking journalism courageously exposing institutional corruption wherever it may lie, and to establish Defendants' liability for the harm that they have caused to Project Veritas' reputation due to the reckless publication of these false and defamatory statements, both in the original EIP Blog Post and The New York Times story republishing and amplifying those defamatory falsehoods.  Project Veritas seeks an award of presumed and compensatory damages and, given the willful and malicious nature of Defendants' conduct in knowingly publishing falsehoods out of a desire to cause harm, Project Veritas also seeks an award of punitive damages.

## THE PARTIES AND OTHER RELEVANT PERSONS

10.     Plaintiff Project Veritas is an independent journalistic organization founded in 2011 by journalist James O'Keefe, who serves as its President, Chief Executive Officer, and Chairman of its Board of Directors.  Project Veritas is a non-profit, nonstock corporation incorporated under the laws of the Commonwealth of Virginia, with its principal place of business in Mamaroneck, New York.

11.     Defendant The Leland Stanford Junior University, commonly known simply as "Stanford University," is a non-profit corporate trust organized under California law and with its principal place of business in Stanford, California.  Stanford University is one of the "foundational" partners of the Election Integrity Partnership through the participation of The

Stanford Internet Observatory, which is a Stanford University program that is part of Stanford's Freeman Spogli Institute of International Studies.

12. Alex Stamos is identified on the Blog Post as one of its six individual authors. Mr. Stamos, formerly the Chief Security Officer at Facebook, is an adjunct professor at Stanford and the Director of the Stanford Internet Observatory.

13. Elena Cryst is identified on the Blog Post as one of its six individual authors. She is employed by Stanford as the Assistant Director of the Stanford Internet Observatory.

14. Isabella Garcia-Camargo is identified on the Blog Post as one of its six individual authors. At the time of the publication of the Blog Post, she was employed by Stanford as Research Analyst and Special Projects Manager at the Stanford Internet Observatory.

15. Defendant the University of Washington is a public research university located in Seattle, Washington. It is authorized by Washington statutes and is an agency of the State of Washington. Defendant the University of Washington is a "foundational" partner of the Election Integrity Partnership through the University of Washington Center for an Informed Public, which is a multidisciplinary research center created by the University of Washington's School of Law, the University of Washington's Information School, and the University of Washington's Department of Human Centered Design and Engineering.

16. Dr. Kate Starbird is identified on the Blog Post as one of its six individual authors. She is an Associate Professor at the University of Washington and the co-founder of the University of Washington's Center for an Informed Public.

17. Dr. Joe Bak-Coleman is identified on the Blog Post as one of its six individual authors. He is a post-doctoral fellow at the University of Washington Center for an Informed Public.

18.     Joey Schafer is identified on the Blog Post as one of its six individual authors.  He is an undergraduate student studying Computer Science and Ethics at the University of Washington, and he worked in 2020 as a research assistant to Dr. Starbird.

### JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this suit under 28 U.S.C. § 1332 because the parties are completely diverse and Plaintiff's claims for damages are in excess of $75,000.

20.     This Court has personal jurisdiction over Defendant Stanford University under RCW § 4.28.185 because Plaintiff's claims arise from Defendant's acts of transacting business within the State of Washington in coordination with Defendant the University of Washington, and Defendant's commission of a tortious act within the State of Washington.  Specifically, employees and agents of Stanford worked jointly with employees and agents of the University of Washington, who reside in the State of Washington and while they were physically present in the State of Washington, to create the EIP website where the Blog Post was published, and to plan, research, draft, and publish the specific defamatory Blog Post at issue here.  Agents and employees of Stanford directed numerous electronic communications and telephone calls to their counterparts in Washington while their counterparts were physically present in the State of Washington in furtherance of the effort to plan, research, draft, and publish the Blog Post at issue.  In addition, the defamatory Blog Post was shared and reviewed by individuals within the State of Washington.  Stanford thus directed its underlying activities concerning the Blog Post to the State of Washington, and thereby subjected itself to personal jurisdiction in the State of Washington.

21.     This Court has general personal jurisdiction over Defendant the University of Washington because it is an agency of the government of the State of Washington.

22.   Venue is proper in Federal District Court for the Western District of Washington pursuant to 28 U.S.C. § 1391 because Defendant the University of Washington resides in this district and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### Project Veritas is a Not-For-Profit Journalistic Organization Dedicated to Investigating and Uncovering Corruption

23.   Project Veritas was established in 2011 as a not-for-profit journalism enterprise.

24.   Project Veritas' mission is to focus on investigating and exposing corruption, dishonesty, self-dealing, waste, fraud, and other misconduct in both public and private institutions to achieve a more ethical and transparent society.

25.   Project Veritas and its band of "guerilla journalists" often work undercover and enlist the help of whistleblowing insiders to identify and expose institutional corruption.

26.   One of the calling cards of Project Veritas' journalism is to enlist the help of knowledgeable insiders as sources and, importantly, to strive to obtain audio and/or video evidence that shows irrefutable proof of wrongdoing.

27.   Some of Project Veritas' successes include: exposing Democrat New York City officials admitting on camera that rampant voter fraud exists in the city and is allowed to flourish to benefit the party; capturing a CNN producer admitting on camera that the network is biased against Donald Trump and that few within CNN's ranks take journalistic ethics seriously; and publishing leaked insider "hot mic" recordings of an ABC reporter detailing how ABC management spiked her story that would have exposed the pedophile Jeffrey Epstein years before the public became aware of his crimes.

28.   Project Veritas' stated core values include moral courage, leadership, collaboration,

1    and resilience.

2         29.    The organization is guided by a set of published ethical values—and value

3    Number 1 is that "truth is paramount."  Project Veritas reporting must be based on facts with clear

4    and irrefutable video and audio content.  As stated on the Project Veritas website: "[w]e never

5    deceive our audience.  We do not distort the facts or the context.  We do not 'selectively edit.'"

6

7         30.    In fact, Project Veritas' efforts at transparency and truth-telling are so robust that it

8    prominently features on its website a "Mistakes" section, which lists and acknowledges errors that

9    Project Veritas has made and explains what occurred and the lessons learned.  Most mainstream

10   media outlets do not do this at all—or to the extent they do, they bury errors in a rote and difficult-

11   to-find "corrections" section that makes no effort to explain to readers how the mistake was made

12   and what will be done to prevent errors in the future.

13

14   **The "Election Integrity Partnership" is a Partisan Effort Dedicated to Downplaying the
     Threat of Voter Fraud and Supporting Democrat Candidates**

15        31.    The Election Integrity Partnership describes itself as a non-partisan coalition of

16   research entities devoted to identifying election-related disinformation.

17

18        32.    It was started by Alex Stamos, the Director of the Stanford Internet Observatory, at

19   the urging of Isabella Garcia-Camargo—who was at the time a research assistant and special

20   projects manager at the Stanford Internet Observatory.  Mr. Stamos and Ms. Garcia-Camargo

21   formed the EIP by partnering with the University of Washington Center for an Informed Public,

22   which is directed by Dr. Kate Starbird.

23

24        33.    Mr. Stamos, Ms. Garcia-Camargo, and Dr. Starbird, acting within the scope of their

25   employment as employees of Stanford and the University of Washington, are the principals of the

26   EIP.

27

34.     Despite its name, the Election Integrity Partnership is not actually dedicated to helping ensure that U.S. elections are free from fraud and illegal voting practices.  Instead, the EIP's entire purpose is to try and convince the public that there is no such thing as voter fraud, and that any allegations of voter fraud are right-wing propaganda designed to "suppress voting" and "delegitimize election results without evidence."

35.     In furtherance of this effort, the EIP dedicates much of its work to labeling any suggestions of voter fraud or improper voting activity as "disinformation"—false information that is placed in the public domain intentionally and strategically to deceive its audience.  It then contacts social media companies such as Facebook and Twitter to notify them of their "findings" and demand that they remove the so-called "disinformation."  This is part of an ongoing effort to silence conservative voices under the guise of academic analysis.

36.     Thus, the EIP is a partisan effort masquerading as an academic one.

37.     Indeed, one of the primary outside funders of the EIP is "Craig Newmark Philanthropies," which is headed and funded by Craigslist founder Craig Newmark, a prominent and major Democrat donor.

38.     Alex Stamos, a founder of EIP, Director of the Stanford Internet Observatory, and one of the authors of the Blog Post at issue, makes no secret of his political preferences.

39.     While Mr. Stamos was still working at Facebook, he attended a meeting of a "Tech Solidarity" group—a gathering of tech employees "concerned about President-elect Donald Trump and what his administration may require of Silicon Valley companies."[2]  Notably, although attendees of the meeting were granted anonymity, Mr. Stamos deliberately made his attendance

---

[2] Tess Townsend, *Silicon Valley's Rank and File Prepare to Fight Trump*, Recode (Jan. 10, 2017), https://www.vox.com/2017/1/10/14201450/tech-trump-secret-meeting-labor-strike-pressure.

and support for the effort known publicly.[3]

40.     In a 2018 interview with Slate, when asked to reflect on President Trump's 2016 electoral campaign, Mr. Stamos said, "personally, I found pretty much everything Trump wrote during the campaign to be personally insulting and disgusting."[4]

41.     In March 2019, Mr. Stamos announced that he was advising multiple 2020 Democrat presidential campaigns,[5] and in January 2021, he repeatedly called for major media companies and social media platforms to "turn down" the capability of prominent conservatives to reach large audiences.[6]

42.     For his part, Mr. Stamos also had personal reasons for wanting to harm Project Veritas.  During his tenure as the Chief Security Officer at Facebook, Mr. Stamos spearheaded an initiative that was supposedly designed to allow Facebook to "deboost" user-posted content that was viewed as harmful—such as, for example, content that was racist or could lead to violence.

43.     But Project Veritas, through its guerilla journalists and with the help of a courageous Facebook insider willing to tell the truth, uncovered that Mr. Stamos and Facebook were actually using the "deboost" program to target conservative users.  Specifically, Facebook engaged in a concerted effort to downgrade posts from "blue check" conservatives (a blue check, or "verified badge" from Facebook means that the person is a "well-known, often searched person),

---

[3] *Id.*
[4] Will Oremus, *Alex Stamos Is Still Living the 2016 Election*, Slate (Nov. 21, 2018), https://slate.com/technology/2018/11/what-former-facebook-security-chief-alex-stamos-says-about-that-damning-nyt-story.html.
[5] Brian Schwartz, *Democrats gear up for potential 2020 cyberthreats with help from Silicon Valley and security firms*, CNBC (Mar. 25, 2019), https://www.cnbc.com/2019/03/25/democrats-gear-up-for-potential-2020-cyber-threats-with-help-from-silicon-valley-and-security-firms.html.
[6] *How to Cover the Information Crisis — and Curb It*, CNN (Jan. 17, 2021), https://www.cnn.com/videos/business/2021/01/17/how-to-cover-the-information-crisis--and-curb-it.cnn.

thus lessening the chances that those posts would be seen by other users.  What was claimed to be an effort to make Facebook safer became, under Mr. Stamos's watch, a partisan effort to suppress conservative voices and viewpoints.



44.    Because Project Veritas had exposed politically-motivated wrongdoing on Mr. Stamos's part while he was at Facebook, in addition to his political biases, Mr. Stamos also had a personal vendetta against Project Veritas and saw the EIP Blog Post as an opportunity to settle the score.

45.    The others individual authors of the EIP Blog Post share Mr. Stamos's political biases, as their public conduct reveals that they are vehemently opposed to conservative viewpoints and Republican politicians.

46.     Elena Cryst has publicly posted Tweets suggesting that she has a liberal political bias and is critical of President Trump:[7]



⁷     Peter    Hartlaub    (@peterhartlaub),    Twitter    (Jan.    7,    2021,    2:08    am), https://twitter.com/peterhartlaub/status/1347077668542377985,    *retweeted  by*    Elena    Cryst (@elenacryst),   Twitter   (Jan.   7,   2021),   https://twitter.com/elenacryst;   Jane   Lytvnenko (@JaneLytv),    Twitter    (Nov.    5,    2020,    2:25    pm) https://twitter.com/JaneLytv/status/1324432598823800833,    *retweeted  by*    Elena    Cryst (@elenacryst),   Twitter   (Nov.   5,   2020),   https://twitter.com/elenacryst;   Elena   Cryst (@elenacryst), Twitter (Nov. 4, 2020, 6:06 pm), https://twitter.com/elenacryst/status/132412589 4617673729;  Vanessa  Molter  (@VanessaMolter),  Twitter  (Oct.  31,  2020,  11:20  pm), https://twitter.com/vanessa_molter/status/1322740205036531713,  *retweeted  by*  Elena  Cryst (@elenacryst),  Twitter  (Oct.  31,  2020),  https://twitter.com/elenacryst;  Graham  Brookie (GrahamBrookie),    Twitter    (Oct.    22,    2020,    9:34    pm), https://twitter.com/GrahamBrookie/status/1319452169238573056,  *retweeted  by*  Elena  Cryst (@elenacryst),  Twitter  (Oct.  22,  2020),  https://twitter.com/elenacryst;  Elena  Cryst  (@elenacryst), Twitter (Sept. 29, 2020, 11:31 pm), https://twitter.com/elenacryst/status/1311146541776740352; Elena    Cryst    (@elenacryst),    Twitter    (Sept.    22,    2020,    8:48    pm), https://twitter.com/elenacryst/status/1308568919658000384.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110

47.     Similarly, Isabella Garcia-Camargo has posted numerous Tweets or re-Tweets critical of Trump, conservatives more generally, or which are pro-Biden:[8]



48.     Dr. Kate Starbird, who is the head of the University of Washington Center for an Informed Public and who early on agreed to partner with Mr. Stamos to form the EIP, is also a left-leaning academic who has used her position to promote liberal ideas and criticize conservatives.

---

[8] *See* Isabella Garcia-Camargo (@igarciacamargo), Twitter (May 4, 2021, 6:34 pm), https://twitter.com/igarciacamargo/status/1389710117013102597; Isabella Garcia-Camargo (@igarciacamargo), Twitter (Jan. 13, 2021, 9:26 pm), https://twitter.com/igarciacamargo/status/1349543504137998337; Isabella Garcia-Camargo (@igarciacamargo), Twitter (Sept. 29, 2020, 10:49 pm), https://twitter.com/igarciacamargo/status/1311135962546626561; Isabella Garcia-Camargo (@igarciacamargo), Twitter (Jan. 20, 2021, 12:47 pm), https://twitter.com/igarciacamargo/status/1351949425111797762; Isabella Garcia-Camargo (@igarciacamargo), Twitter (Jan. 20, 2021, 12:46 pm), https://twitter.com/am__taylor/status/1351949181255118852.

49.     Dr. Starbird has focused her recent academic career on promoting the notion that conservatives spread "misinformation" to the public, while entirely ignoring exaggerations and untruths spread by those on the other end of the political spectrum.

50.     Dr. Starbird also regularly publishes posts on social media attacking and criticizing Republicans and Republican politicians:[9]



[9] Kate Starbird (@katestarbird), Twitter (Sept. 17 2020, 5:53 pm),
https://twitter.com/katestarbird/status/1306712840586145793;
Kate Starbird (@katestarbird), Twitter (Sept. 12 2020, 3:05 pm),
https://twitter.com/katestarbird/status/1304858772586651648;
Kate Starbird (@katestarbird), Twitter (Aug. 27, 2020, 12:44 pm),
https://twitter.com/katestarbird/status/1299025036834004993;
Kate Starbird (@katestarbird), Twitter (June 9, 2020, 11:16 am),
https://twitter.com/katestarbird/status/1270374154831753216;
Kate Starbird (@katestarbird), Twitter (Sept. 25, 2029, 5:42 pm),
https://twitter.com/katestarbird/status/1176975381955407872;
Kate Starbird (@katestarbird), Twitter (Aug. 21, 2029, 7:42 pm),
https://twitter.com/katestarbird/status/1164321945304780801.

51.     Joey Schafer has also posted numerous tweets evidencing his liberal political leanings.  For instance, he explicitly posted Tweets in support of then-President-elect Biden in the fall of 2020, and following the January 6 riot at the Capitol, he called for Twitter to de-platform Trump:[10]



52.     Throughout its short existence, the EIP has published numerous posts and "analyses" proclaiming that conservatives are spreading election disinformation.  ***It has never once labeled anything said by a Democrat as misinformation or disinformation***.

---

[10]    Joey Schafer (@Joey_Schafer), Twitter (Nov. 22, 2020, 4:01 pm), https://twitter.com/Joey__Schafer/status/1330617320603959296; Joey Schafer (@Joey_Schafer), Twitter (Nov. 29, 2020, 12:29 pm), https://twitter.com/Joey__Schafer/status/1333100801456148480; Joey Schafer (@Joey_Schafer), Twitter (Nov. 30, 2020, 4:22 pm), https://twitter.com/Joey__Schafer/status/1333521780162453504; Joey Schafer (@Joey_Schafer), Twitter (Jan. 17, 2021, 1:40 am), https://twitter.com/Joey__Schafer/status/1350694503586299905; Joey Schafer (@Joey_Schafer), Twitter (Jan. 23, 2020, 7:24 pm), https://twitter.com/Joey__Schafer/status/1353136482664366080; Joey Schafer (@Joey_Schafer), Twitter (Jan. 25, 2021, 12:34 pm), https://twitter.com/Joey__Schafer/status/1353758170477285376; Joey Schafer (@Joey_Schafer), Twitter (Mar. 17, 2021, 6:38 pm), https://twitter.com/Joey__Schafer/status/1372316472358309889.

53.     Behind a veil of non-partisanship, the EIP pursued its true aim of persuading social media companies to target conservative actors by publishing blog posts identifying those actors as promoters of election disinformation—and then attempting to have Facebook, Twitter, and others ban those speakers, take down the relevant content, prevent that content from being shared, or have the content labeled misinformation.

54.     In fact, throughout its short existence, the EIP published twenty "Rapid Response" blog posts identifying supposed election dis- or misinformation.  Of those, seventeen targeted political conservatives or narratives primarily associated with the political right, such as ballot-harvesting and concerns about mail-in voting.  And the few that made any mention of statements by those aligned with the political left were limited to criticizing those individuals for "amplifying" right-wing "misinformation" by discussing it.

55.     In short, the EIP is ***not***—and never was—a non-partisan, third-party purveyor of unbiased information designed to safeguard the integrity of U.S. elections.

56.     To the contrary, the EIP is solely focused on targeting conservatives to shape a media narrative that conservatives engage in wide-scale election disinformation campaigns, and that legitimate concerns over the integrity of practices like mail-in voting and ballot harvesting are nothing more than conservative propaganda designed to suppress the Democrat vote.

**Project Veritas Releases a Bombshell Report on Illegal Voting Practices Taking Place Within Minneapolis' Somali-American Community**

57.     On September 27, 2020, Project Veritas published a news report titled, "Ilhan Omar Connected Cash-for-Ballots Voter Fraud Scheme Corrupts Elections."[11]

---

[11] *Ilhan Omar Connected Cash-For-Ballots Voter Fraud Scheme Corrupts Elections: "These Here Are All Absentee Ballots...Look...My Car Is Full..." 'Money Is The King Of Everything,*' Project Veritas (Sept. 27. 2021), https://www.projectveritas.com/news/ilhan-omar-connected-cash-for-ballots-voter-fraud-scheme-corrupts-elections/.

58.     Project Veritas published the Video Report on its website, as well as on various social media and video-sharing sites.

59.     Much of the Video Report is centered on self-recorded video clips posted to the social media site Snapchat in the first week of July 2020 by a man named Liban Mohamed.  At the time, Mr. Mohamed's younger brother—a man named Jamal Osman—was running for a vacant seat on the Minneapolis City Council to represent Ward 6.

60.     Ward 6 is Minneapolis' most densely populated district, and a large part of its population is made up of residents of Somali heritage.  Mr. Osman ultimately won that election in August 2020 and currently sits on the City Council.

61.     In the videos that he posted to Snapchat, Liban Mohamed openly brags about having a car filled with hundreds of absentee ballots that he collected from voters.

62.     In one of the videos, Mr. Mohamed states: "You can see my car is full.  All these here are absentees' ballots.  Can't you see?  Look at all these, my car is full.  All these are for Jamal Osman….  We got 300 today for Jamal Osman."  The video clearly depicts Mr. Mohamed driving in a car that is full of ballots and envelopes.



63.     Another video posted by Mr. Mohamed shows him walking out of what appears to be an apartment building with his hand full of envelopes of ballots, while saying, "[t]wo in the morning.  Still hustling."



64.     Mr. Mohamed also wrote a caption on his video that stated: "Two in the morning still working and collecting absentee ballots."

65.     This activity, known as "ballot harvesting," is illegal under Minnesota election law, which prohibits any person from delivering more than three absentee ballots on behalf of others.

66.     In other words, in these videos, Liban Mohamed blatantly incriminates himself and admits to serious violations of Minnesota's election laws on behalf of his Democrat brother, and current Minneapolis City Councilman, Jamal Osman.

67.     Moreover, Mr. Mohamed's videos show what plainly appear to be open envelopes—meaning that the ballots Mohamed illegally harvested were not sealed.  This strongly suggests even more nefarious conduct, as the ballots may have been collected without even having been filled out (and certainly not sealed) by the actual voter.  Notably, other local sources featured in Project Veritas' investigative report directly alleged that Democrat operatives in Minneapolis

have been openly paying voters to exchange their blank voter forms for cash, with the ballots then filled out by staff working for the candidate.

68.     Obviously, such a practice is highly illegal and an afront to the very idea of open and fair elections.  Offering money in exchange for votes is a felony under both Minnesota and federal election law.

69.     The Project Veritas Video Report also featured interviews with multiple firsthand sources who connected Liban Mohamed to Rep. Ilhan Omar's campaign.

70.     Outside of the self-incriminating videos Mr. Mohamed filmed of himself, the primary on-the-record source for the Video Report was a man named Omar Jamal.  Mr. Jamal is employed full-time as a community service officer for the Ramsey County Sheriff's Office, and he is a longtime community leader and political consultant in the Minneapolis Somali-American community who has founded several community organizations.  He is regularly quoted on the record in mainstream media organizations as a source who is credible and knowledgeable about events in Minneapolis' Somali-American community—including frequently by The New York Times.

Veritas' On-The-Record Source Has Appeared Repeatedly In The New York Times

71.    In a videotaped interview with Project Veritas, Mr. Jamal stated that Liban Mohamed not only worked for his brother Jamal Osman's campaign, but also for Rep. Ilhan Omar.

72.    During his interview, Mr. Jamal stated that there was widespread voter fraud within, and victimizing the citizens of, the Minneapolis Somali-American community. Mr. Jamal worked with Project Veritas to record interviews and conversations with various Somali-American participants who detailed how the illegal vote-harvesting scheme works.

73.    First, as featured in the Project Veritas Video Report, Mr. Jamal recorded a telephone conversation with Liban Mohamed himself, who detailed the vote-harvesting scheme depicted in his self-incriminating videos. During that conversation, Mr. Mohamed confirmed that

teams of ballot harvesters in the community would request absentee ballots from elderly voters, and then return to pick those ballots up when they arrived.  Mr. Jamal stated that this practice of requesting and collecting absentee ballots from elderly voters is widespread.

74.    The Project Veritas Video Report also featured footage of an interview with a confidential source who is a firsthand witness to these practices.  This source matter-of-factly admitted that ballot harvesters working for Rep. Ilhan Omar and other Democrat candidates would visit apartment buildings and fill out absentee ballot request forms for voters, then return to pick up the ballots when they arrived *and fill them out as well*.  This source also stated that these voters were then paid for their votes once the voters signed their completed ballots.

75.    Another confidential source, a former Minneapolis political worker, described in a recorded interview how specific apartment towers filled with primarily elderly voters were targeted by campaign workers for ballot harvesting.  This source described how ballot harvesters would arrive with bags of money and pay voters cash for their absentee ballots.

76.    The very same source identified the mastermind of this scheme as Alli Isse Gainey. Gainey worked on Rep. Omar's 2018 congressional campaign and is identified on campaign finance disclosures as being involved in "CANVASSING, FIELDWORK ORGANIZING, [and] POLICY CONSULTING" for Rep. Omar's campaign.[12]

---

[12] *Disbursements, Ilhan For Congress*, Federal Election Commission (2019-2020), https://www.fec.gov/data/disbursements/?data_type=processed&committee_id=C00680934&recipient_name=Gainey&two_year_transaction_period=2020.

1

2

3

4

5

6

7

8

9

10

11



77.     Project Veritas' primary source, Omar Jamal, confirmed this confidential source's claims, stating in an on-camera interview with Project Veritas that Mr. Gainey was one of the individuals known to offer cash for votes for Rep. Ilhan Omar:



78.     The Project Veritas Video Report also featured a recorded conversation with AJ Awed, who ran against Jamal Osman in 2020 for the Minneapolis City Council seat representing Ward 6.  Mr. Awed similarly bemoaned the corruption in Minneapolis elections, and charged that the perpetrators included Rep. Ilhan Omar and Jamal Osman (brother of Liban Mohamed), who were all part of an extended Somali-American family (or "clan") engaged in corrupt voting activity.

 

79.     The Project Veritas report concludes with a call by Project Veritas for the Attorneys General of Minnesota and the United States to investigate these allegations.

**The EIP Publishes a Blog Post Falsely Characterizing the Veritas Video Report in an Effort to Discredit it and Distract from the Clear Evidence of Illegal Voting Practices**

80.     Confronted with a bombshell Project Veritas report that exposed clear evidence of illegal voting practices favoring Democrat politicians in Minneapolis, six individual members of the EIP—Mr. Stamos, Ms. Cryst, and Ms. Garcia-Camargo of Stanford, and Dr. Starbird, Mr. Schafer, and Dr. Bak-Coleman of the University of Washington—leapt into action to try and discredit the Project Veritas Video Report and portray it as yet another example of conservative election "disinformation."

81.     On September 29, 2020—just two days after Project Veritas published its Video Report—the above individuals published the Blog Post on the EIP website entitled, *Project Veritas #BallotHarvesting Amplification.*

82.     The majority of the Blog Post purported to be a technical study of whether and how prominent conservatives had worked to promote and "aggressively spread" the Project Veritas Video Report.

83.     But the opening paragraph took direct aim at Project Veritas' journalism:

> On Sunday night, a right-wing activist group, Project Veritas, released a video alleging illegal ballot harvesting in Minnesota. The video made several falsifiable claims that have either been debunked by subsequent reporting or are without any factual support. As the video calls into question the integrity of the election using misleading or inaccurate information, we determined this video to be a form of election disinformation. While we have reported our findings to the relevant online platforms, this video stands as an interesting example of what a domestic, coordinated elite disinformation campaign looks like in the United States. This post will explore the timeline of how the ideas in this video were initially seeded and then aggressively spread.

84.     Notably, the EIP Blog Post did not identify *anything* in the Video Report that was "debunked," "misleading," or "inaccurate," was "without any factual support," or that constituted "disinformation." The Blog Post simply made those statements without providing any factual basis or support for them—other than claiming that the Video Report was released by "a right-wing activist group."

85.     In fact, the Blog Post did not even link to the Video Report, which would have allowed readers to judge for themselves whether Project Veritas made "falsifiable claims" that were "without any factual support."

**The EIP and The New York Times Engage in a Secret, Coordinated Disinformation Campaign to Try and Discredit Project Veritas' Video Report**

86.     Because the Project Veritas Video Report had gone "viral" and was being seen by millions of people, the EIP Blog Post authors knew that they would need a similarly large platform to try and discredit it. They found a willing partner in The New York Times.

87.     On the same day that Project Veritas published its Video Report about illegal voting practices in Minneapolis, The New York Times published a detailed story about President Trump's

business and tax history, which claimed to be based upon tax return data provided to The Times by an unidentified source.

88.    The New York Times and other journalists had been seeking President Trump's tax returns for years.  The Times believed it had scored a reporting coup and expected its story to cause a huge splash.

89.    It did, but the Project Veritas Video Report also quickly went viral and became one of the top trending topics on Twitter—competing with The New York Times tax returns story for prominence.  Within just two hours of the publication of the Video Report, it had been the subject of nearly as many tweets as The New York Times' tax returns story (162k vs 165k).



90.    The New York Times' political reporting team was upset that its much-hyped story about a Republican president's tax returns was upstaged by an independent journalism group's story presenting, in an election year, evidence of systematic and widespread voting fraud by Democrat candidates.

91.     Thus, along with its inherent and well-documented liberal bias, The Times now had a vested, competitive interest in discrediting the Project Veritas Video Report.

92.     With their interests and goals aligned, The New York Times and the EIP Blog Post authors resolved to work together to attack Project Veritas and its Video Report.

93.     On information and belief, Mr. Stamos acted as the connection between the Blog Post authors and The New York Times.

94.     Mr. Stamos has had a relationship with The Times going back several years.  In 2018, for instance, The Times published several articles praising Mr. Stamos for his criticism of Facebook's handling of Russian disinformation during the 2016 election and for his subsequent decision to leave the company in 2018.  Since then, Mr. Stamos has sat for an interview with Times reporter Kara Swisher in the fall of 2020, and he has also authored several articles published by The Times.

95.     Mr. Stamos had also previously used his connection to The Times to generate positive press for the EIP.  On September 9, 2020, The Times published an article by Mr. Stamos and fellow Stanford employee and EIP member Renee DiResta.  The article promoted the EIP's thesis that there needed to be a collaborative effort between researchers identifying election misinformation, journalists reporting on election misinformation, and social media companies applying disinformation policies.  And on September 27, 2020, The Times editorial board published an Op/Ed endorsing the framework developed by the EIP for grading social media platforms' ability to control election misinformation and advocating for social media companies to develop robust policies to detect and act against election disinformation.

96.     On information and belief, Mr. Stamos used his connections to establish a backchannel to New York Times reporter Maggie Astor, and the two hatched a plan.  To write a

New York Times **news** story attacking Project Veritas' journalism, Ms. Astor knew that The Times needed some underlying pretext to "report on."  So, they determined that the EIP would publish its Blog Post claiming that the Project Veritas Video Report was misleading and disinformation, which The Times could then use as a basis for its own story repeating and expanding upon those claims.  The EIP would also provide a draft of its Blog Post to Ms. Astor and The Times in advance of publication, so that Ms. Astor could write her story about the EIP Blog Post before it was even published and push out her New York Times story as soon as possible after the Blog Post was published.  The Times and EIP coordinated to ensure that neither The Times nor EIP would seek comment from Project Veritas about either the Blog Post or The Times' article, ensuring that Project Veritas would have no opportunity to debunk or respond to The Times' and the EIP's preconceived narrative that the Video Report was "disinformation," or that the Video Report was strategically timed to minimize the impact of The Times' story on President Trump's tax returns.

97.     The illicit, behind-the-scenes coordination between the EIP authors and The Times is proven by irrefutable website metadata, which reveals that The Times published Ms. Astor's September 29, 2020 story about the EIP Blog Post less than 63 minutes after the EIP Blog Post was published on the EIP website.  This information is readily available in the source code that can be accessed by right-clicking on the respective webpages:



98.     The 'source code' is the computer code created by the owner of the web page to construct live web pages, and it is published by the owner of the web page at the time the page goes live.  Anyone may access the source code by simply right-clicking on the selected page and choosing "view source."  The source code supports *all* the visible text on a web page, including non-visible information from the web page, such as the date and time of publication or any modifications to the web page.  The source code often will contain the time of publication in 'coordinated universal time' ("UTC"), also known as "Zulu time," indicated by the letter 'Z' at the end of the time-stamp—or in local time, followed by either a plus sign preceding the number of hours local time is *ahead* of UTC-time or a minus sign followed by the number of hours *behind* UTC-time.

99.     Here, the EIP webpage's source code indicates that the Blog Post was published at "14:08:54-0700": the absence of the 'z' indicates that the time-stamp reflects local time, and the "-0700" demonstrates that local time is seven hours *behind* UTC time.  Pacific Daylight Time ("PDT") is seven hours behind UTC time, and thus, EIP published the Blog Post at 2:08 pm PDT—which is 5:08 pm Eastern Daylight Time ("EDT").

100.     The Times' own source code indicates that Ms. Astor's article was published at "22:11:25-000z," which means that the article was published at 10:11 pm UTC.  Because EDT is four hours behind UTC time, the source code reflects that The Times published Astor's story at 6:11 pm EDT.  Thus, The Times published its story less than 63 minutes after the EIP Blog Post was published.

101.     Obviously, in the span of only one hour, Ms. Astor would not have been able to (1) read and digest EIP's **twelve-hundred-word** Blog Post; (2) contact the EIP authors for comment; (3) contact others quoted in the story for comment; (3) write her own nearly **thousand-word** article; and (4) submit her draft article to her editors at The Times for review and approval.

102.     The inescapable conclusion revealed by the timing of Ms. Astor's story is that EIP provided her with a draft of the Blog Post well in advance of when it was actually published, so that The New York Times could publish its own story highlighting the Blog Post shortly after it was released, thus greatly increasing its reach and visibility.

103.     Thus, while the EIP authors accused Project Veritas of engaging in an "elite disinformation campaign," it was actually the EIP and their collaborators at The New York Times that engaged in a coordinated effort to spread and amplify disinformation about Veritas' journalism in an effort to advance their politically motivated narrative that illegal voting practices do not exist and are merely a boogeyman created by the political right.

**The New York Times Rapidly Publishes Three Stories by Maggie Astor Using the EIP Blog Post as a Pretext to Attack Project Veritas' Video Report as "Deceptive"**

104.     On September 29, 2020—just two days after Project Veritas released its Video Report—The Times published a story by Maggie Astor on its website with the headline, "Project Veritas Video Was a 'Coordinated Disinformation Campaign,' Researchers Say."

105.     The "dek" (or subheading) of the story stated, "The timing of the deceptive video,

which accuses Ilhan Omar of voter fraud, indicates that several conservatives, including Donald Trump Jr., may have known about it in advance."

106.    The first sentence of the story then says: "A deceptive video released on Sunday by the conservative activist James O'Keefe, which claimed through unidentified sources and with no verifiable evidence that Representative Ilhan Omar's campaign had collected ballots illegally, was probably part of a coordinated disinformation effort, according to researchers at Stanford University and the University of Washington."  This was, of course, a reference to the EIP Blog Post.

107.    Later that same day, Ms. Astor and The Times published a second online story that was a slightly abbreviated version of the first.  It bore a different headline: "Researchers say a Project Veritas video accusing Ilhan Omar of voter fraud was a 'coordinated disinformation campaign.'"  Like the earlier version of the story, the second September 29 story also accused Project Veritas of producing a "deceptive video" that relied on "unnamed sources" and "no verifiable evidence."  This story again attributed to the EIP Blog Post authors the claim that the Project Veritas Video Report was part of a "coordinated disinformation effort."

108.    The following day, September 30, 2020, The Times published Ms. Astor's story in its print edition.

109.    The print version of the story appeared on page A22 of The Times' Monday, September 30, 2020 edition.  It bore a different headline than the online version: "Project Veritas Releases Misleading Video, Part of What Experts Call a Coordinated Effort."

110.    Like the online version of the story, the print version accused Project Veritas of publishing a "deceptive" news report: "A deceptive video released on Sunday by the conservative activist James O'Keefe, which claimed through unidentified sources and with no verifiable

evidence that Representative Ilhan Omar's campaign had collected ballots illegally, was probably part of a coordinated disinformation effort, according to researchers at Stanford University." The article's title also falsely accuses Project Veritas of releasing a "misleading" video.

111.    The print version of the story also featured a call-out in large, bolded type, which said: "Making claims without evidence of ballot harvesting."



*Project Veritas Releases Misleading Video, Part of What Experts Call a Coordinated Effort*

**The Statements in the EIP Blog Post and New York Times Stories Are False and Defamatory *Per Se***

112.    At the time that the EIP Blog Post authors published the Blog Post asserting that Project Veritas' Video Report "alleging illegal ballot harvesting in Minnesota" made "several falsifiable claims," that were "misleading," "inaccurate," and amounted to "disinformation," and at the time they caused The New York Times to publish its stories claiming that the Video Report was "deceptive," relied solely on "unidentified sources," and presented no "verifiable evidence" of illegality, the Blog Post authors knew that these claims were false.

113.    The Project Veritas Video Report is based entirely on on-camera interviews, recorded conversations with knowledgeable sources and firsthand witnesses, and self-recorded videos of actual participants in illegal voting activity. These interviews, recorded conversations,

and self-recorded videos are evidence of illegal voting. And many of Project Veritas' sources were identified by name and provided information on the record.

114. The Blog Post authors viewed the Video Report in full before publishing the Blog Post purporting to describe its contents, including these on-camera interviews, recorded conversations with knowledgeable sources and firsthand witnesses, and self-recorded videos of actual participants in illegal voting activity.

115. Therefore, the Blog Post authors subjectively knew that the Project Veritas Video Report absolutely contained clear evidence of illegal ballot harvesting in Minnesota—which was recorded and uploaded to social media by the very person doing the illegal ballot harvesting.

116. As noted, much of the Video Report is centered on the video clips that Democrat campaign worker Liban Mohamed himself posted to Snapchat, in which he openly brags about illegally harvesting hundreds of absentee ballots in gross violation of Minnesota law that permits a person to collect and submit no more than three absentee ballots from others.

117. Obviously, there was nothing "misleading" or "inaccurate" about Project Veritas presenting to viewers Mr. Mohamed's own self-recorded and self-incriminating statements, and his own recorded admissions **are** verifiable evidence of illegal conduct.

118. Mr. Mohamed is identified by name and his connections to other Democrat Minnesota politicians, including Rep. Ilhan Omar, are set forth by named sources in the Project Veritas Video Report.

119. In fact, the allegation that ballot-harvester Liban Mohamed is connected to Rep. Ilhan Omar's campaign is attested to from the mouths of **two named sources** in the Video Report: Minneapolis City Council candidate AJ Awed, and Ramsey County Sheriff's Office community service officer Omar Jamal.

120.     It was not deceptive for Project Veritas to publish the comments of Mr. Awed complaining about fraudulent voting practices by Mohamed, his brother Jamal Osman, Rep. Omar, as well as widespread corruption in Minneapolis elections.  It is self-evident that Mr. Awed was a credible and reliable source, given that he is a local Somali-American politician who ran as a candidate in the same election as Mr. Mohamed's brother, Jamal Osman.

121.     Outside of the self-incriminating videos Mr. Mohamed filmed of himself, the primary on-the-record source for the Project Veritas report was a man named Omar Jamal. Mr. Jamal is a longtime community leader and political consultant in the Minneapolis Somali-American community who has founded several community organizations and is also employed full-time as a community service officer for the Ramsey County Sheriff's Office.

122.     Mr. Jamal connected Mr. Mohamed and his illegal conduct to Rep. Ilhan Omar, detailed the breadth of ballet harvesting and cash-for-ballots schemes in Minneapolis, identified Rep. Omar's Deputy Campaign Manager Alli Isse Gainey as a known ringleader of these activities, and helped Project Veritas to record interviews and conversations with numerous witnesses and participants with knowledge of these illegal activities.

123.     Thus, the claim in The Times' stories that the Project Veritas Video Report relied solely on "unidentified sources," and the claim in the EIP Blog Post that the Video Report made claims of illegal ballot harvesting "without any factual support," are patently false.

124.     Additionally, the false claims about Project Veritas' journalism in the EIP Blog Post and The New York Times stories are defamatory *per se*.  Defendants' employees and agents published, and caused to be republished, false accusations that Project Veritas—a journalistic organization—intentionally published misleading and inaccurate disinformation and engaged in a coordinated effort to deceive viewers of the Video Report.

125.    It is self-evident that such statements would tend to harm a journalistic organization in its trade and profession, and indeed, that was the EIP and The Times' intent.

126.    These false statements also exposed Project Veritas to hatred, contempt, ridicule, or obloquy, and deprived it of the benefit of public confidence and social intercourse.

**The Times' Foreseeable and Intended Republication of the EIP Blog Post Authors' False Claims Greatly Amplified Their Reach and the Resulting Harm to Project Veritas' Reputation**

127.    Publication of the EIP Blog Post by Defendants' employees and agents has caused Project Veritas to suffer reputational harm.

128.    Even before publishing the Blog Post, its authors reached out to social media sites like Facebook, Twitter, YouTube, and Reddit, falsely claiming that the Video Report was "disinformation" and demanding that users be barred from posting or sharing it.

129.    According to the Blog Post itself, the authors were successful in convincing at least one social media site to "immediately remove[] all examples of the video."

130.    The republication of the EIP Blog Post authors' false and defamatory claims in by The New York Times then caused substantial additional harm to Project Veritas' reputation.

131.    Because the EIP Blog Post authors intentionally coordinated with The New York Times to have The Times stories planted, amplifying the false and defamatory claims made in the Blog Post, The Times' republication of those false and defamatory statements was not only foreseeable, but the EIP specifically intended for these false and defamatory claims to be republished to a worldwide audience.

132.    As one of the most widely circulated papers in the United States and the world, the reach of these defamatory statements was considerable.  According to The Times itself, its print

version boasts a daily circulation of nearly half a million copies in the United States,[13] and The Times has an additional 5.7 million digital subscribers.[14]

133.    Given its status and prominence, it was entirely foreseeable that the false and defamatory statements about Project Veritas in The New York Times stories would also then be widely republished by other media outlets and individuals.

134.    In fact, the false statements in Ms. Astor's stories were widely republished, increasing the reputational harm to Project Veritas.  Various other media outlets and blogs either republished Ms. Astor's false claims verbatim or repeated the claim that the Project Veritas Video Report was "deceptive."[15]

135.    Additionally, Ms. Astor and The Times' claim that Project Veritas published a "deceptive" video was adopted and republished by myriad social media users:

---

[13] *Newspaper Guidelines*, N.Y. Times, https://nytmediakit.com/newspaper-guidelines (last visited Sept. 28, 2021).

[14] Marc Tracy, *Digital Revenue Exceeds Print for 1st Time for New York Times Company*, N.Y. Times (Aug. 5, 2020), https://www.nytimes.com/2020/08/05/business/media/nyt-earnings-q2.html#:~:text=The%20company%20added%20669%2C000%20net%20new%20digital%20subscribers%2C%20making%20the,10%20million%20subscriptions%20by%202025.

[15] *See, e.g.*, Maggie Astor, *Stanford researchers say Ilhan Omar video appears to be 'coordinated disinformation campaign*, Twin Cities Pioneer Press (Sept. 29, 2020), https://www.twincities.com/2020/09/29/stanford-researchers-say-ilhan-omar-video-appears-to-be-coordinated-disinformation-campaign/; Rick Hasen, *Project Veritas Video Was a 'Coordinated Disinformation Campaign,' Researchers Say*, Election Law Blog (Sept. 29, 2020), https://electionlawblog.org/?p=115984.

136.     Defendants are liable for the damage caused by the foreseeable and intended republication of their false and defamatory statements concerning Project Veritas.

**Project Veritas Demands a Retraction of the False Claims and Defendants Refuse**

137.     On September 30, 2020, Project Veritas' Chief Legal Officer sent a retraction demand by letter to the six individual authors of the Blog Post.  Project Veritas noted that the Blog Post contained no support whatsoever for the claims that the Video Report was "misleading," "inaccurate," "without any factual support," and "disinformation."  Project Veritas also pointed out that the Video Report clearly did contain "first hand video accounts of ballot harvesting" and "numerous videos of witnesses (namely, members of the Somali community in Minnesota) discussing how wide spread the ballot harvesting and vote buying scheme is, who is behind it, and why they think it is important."

138.     On October 2, 2020, counsel for Stanford responded by letter to Project Veritas, noting that the response was "joined" by the University of Washington.  Stanford and the

University of Washington refused to retract or make any corrections to the Blog Post, insisting that the statements therein were either true or constituted "expressions of opinion."

139.    Project Veritas' outside counsel, Clare Locke LLP, then sent a letter to counsel for Stanford on January 21, 2021, reiterating Project Veritas' demand for a retraction and again noting Stanford's failure—both in the original Blog Post and its counsel's October 2, 2020 letter—to identify anything in the Video Report that was "misleading," "inaccurate," "without evidence," or "disinformation."

140.    Counsel for Stanford responded the following day, acknowledging receipt and copying counsel for the University of Washington.

141.    On March 3, 2021, counsel for Stanford responded by letter, copying counsel for the University of Washington, and again refusing the demand to correct or retract the Blog Post.

142.    On May 12, 2021, Clare Locke LLP again wrote to counsel for Stanford and the University of Washington.  The letter again demanded a correction/retraction and noted that Project Veritas had instituted litigation against The New York Times based on its republication of the false statements in the Blog Post.  Clare Locke LLP noted that in that suit, a Justice of the New York Supreme Court had recently held that Project Veritas demonstrated that its claims against the New York Times concerning those statements have a "substantial basis."

143.    On May 20, 2021, counsel for Stanford responded by letter.  Stanford reiterated its refusal to retract or correct the Blog Post but expressed a willingness to discuss the matter.  Counsel for the University of Washington responded by email to express its agreement with Stanford's position.

144.    Subsequent communications between counsel for Project Veritas, Stanford, and the University of Washington were unproductive, and Stanford and the University of Washington

maintained their position that they were unwilling to correct or retract the Blog Post.

**Defendants' Tortious Conduct Has Caused Project Veritas to Suffer Special Damages**

145.    In addition to the significant reputational harm that Defendants' conduct has caused, Defendants' actions have also caused Project Veritas to suffer special damages.

146.    By falsely labeling Project Veritas' Video Report as "misleading," "inaccurate," "without evidence," and "disinformation," Defendants caused Project Veritas' significant investment of time, energy, and resources on its groundbreaking investigation to be essentially wasted.

147.    Project Veritas estimates it spent $141,000 in hard costs (e.g., travel, accommodations, security, transcription services, and other external costs, which exclude any internal costs such as production costs or Project Veritas employee time) to research and produce its investigative reporting on illegal voting practices in Minneapolis.  Defendants' tortious acts proximately caused a loss of that investment.

148.    In an effort to attempt to mitigate the harm caused by the publication of Defendants' false statements in the EIP Blog Post, Project Veritas was forced to retain counsel to seek a correction of the EIP's false and defamatory statements.   Stanford and the University of Washington's lawyers refused.

149.    Clare Locke LLP attorneys have to date sent two separate letters to Defendants' lawyers demanding a correction of the false statements about Project Veritas in the EIP Blog Post, but Defendants have maintained their refusal to issue any correction or retraction. Separately, Clare Locke LLP attorneys sent three separate letters to The New York Times' lawyers demanding a correction of the false statements about Project Veritas in Ms. Astor's September 29 and 30, 2021 stories that republished the false and defamatory claims in the EIP Blog Post, but The Times has refused to issue any correction or retraction.

150.    To date, Clare Locke LLP's fees for efforts specifically targeted at mitigating the harm to Project Veritas by seeking retractions from Defendants, and from The Times for its republication of Defendants' false and defamatory statements, exceeds $60,000.00, exclusive of any costs associated with preparing this Complaint and legal fees associated with litigation.

## CAUSES OF ACTION

### First Cause of Action:

### Defamation *Per Se* for Publication of the September 29, 2020 Blog Post

151.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

152.    Defendants, by and through their employees and agents, authored and published false and defamatory statements about Project Veritas in the September 29, 2020 Blog Post published on the EIP website with the title, *Project Veritas #BallotHarvesting Amplification*.

153.    The Blog Post was published at the URL https://www.eipartnership.net/rapid-response/project-veritas-ballotharvesting.  A true and correct copy of the online version of the Blog Post is attached hereto as Exhibit A.

154.    The Blog Post, which was published to a worldwide audience on the EIP website, included the following false and defamatory statements:

> On Sunday night, a right-wing activist group, Project Veritas, released a video alleging illegal ballot harvesting in Minnesota.  The video made several falsifiable claims that have either been debunked by subsequent reporting or are without any factual support.  As the video calls into question the integrity of the election using misleading or inaccurate information, we determined this video to be a form of election disinformation.  While we have reported our findings to the relevant online platforms, this video stands as an interesting example of what a domestic, coordinated elite disinformation campaign looks like in the United States.

155.    These statements were meant to, and in fact did, create the false impression that Project Veritas published a misleading and inaccurate video news report about illegal ballot harvesting in Minnesota without any factual support that was intended to deceive the public.

156.    These statements were reasonably understood by those reading them to be statements of fact regarding Project Veritas.

157.    As set forth herein, these statements are false.

158.    These statements are of and concerning Project Veritas.

159.    The reading public would have understood, and did understand, these statements to be of and concerning Project Veritas.

160.    Defendants had no applicable privilege or legal authorization to publish these false and defamatory statements or, if they did, they abused that privilege.

161.    These statements are libelous because they tend to expose Plaintiff to public contempt, ridicule, aversion, or disgrace, and to induce an evil opinion of Plaintiff in the minds of right-thinking persons, and to deprive Plaintiff of friendly intercourse in society.

162.    These statements defamed Project Veritas by falsely accusing a journalistic organization of publishing "disinformation" to deceive and mislead viewers—a cardinal sin that is the most egregious and fundamental violation of journalistic ethics and standards, as well as of Project Veritas' own stated mission and ethical tenets.

163.    These statements are libelous *per se* because they impugn the basic integrity, ethics, and competence of Project Veritas as a journalistic organization.

164.    These statements are libelous *per se* because they would tend to harm, and indeed have harmed, Project Veritas in its trade, business, and profession, and would tend to assail, and indeed have assailed, Project Veritas' integrity and journalistic ethics.

165.   These statements are libelous *per se* because they impute unfitness in the performance of one's profession or trade to Project Veritas.

166.   Defendants published these statements with actual malice in that they had knowledge that the statements were false, or they published the statements with reckless disregard for their truth or falsity.

167.   Defendants published these statements with actual malice in that they recklessly disregarded contradictory information in their possession—including the Project Veritas Video Report itself—demonstrating the falsity of these statements.

168.   Defendants published these statements with actual malice in that they purposefully avoided the truth by failing to contact Project Veritas, or any of the named sources in the Video Report, to fact check the claims they planned to publish before publishing the Blog Post.

169.   Defendants published these statements with actual malice by failing to sufficiently investigate the truth or falsity of the statements before publishing them.

170.   Defendants also repeatedly failed to retract or correct these false and defamatory statements despite multiple requests that they do so, thereby further demonstrating that they published these statements with actual malice.

171.   Defendants also acted with actual malice by publishing a preconceived narrative— working hand in hand with The New York Times to develop the thesis and preconceived storyline before publication.

172.   Defendants also acted with actual malice and common law malice because they were motivated by political bias, personal bias, retaliatory motive, and ill will towards Plaintiff.

173.   Defendants also acted with actual malice by knowingly violating the Stanford University Research Misconduct Policy that requires faculty, staff, and students to exercise

intellectual honesty and integrity and prohibits fabrication and falsification of research results.

174.    Defendants also acted with actual malice by knowingly violating the Stanford University Code of Conduct that requires faculty, staff, and students to act with integrity and honesty, prohibits the making of false accusations with the intent of harming or retaliating against another, and prohibits engaging in tortious activity such as defamation.

175.    Defendants also acted with actual malice by violating the Stanford University Statement on Faculty Discipline, which prohibits faculty from engaging in a reckless disregard for accuracy.

176.    Defendants also acted with actual malice by knowingly violating the University of Washington Research Misconduct Policy that requires faculty, staff, and students to exercise integrity in carrying out research activities and prohibits fabrication and falsification of research results.

177.    Defendants acted with actual malice and common law malice because they sought to harm Plaintiff's reputation as part of a politically motivated effort to portray instances of illegal voting practices in favor of Democrats as false propaganda spread by those on the political right.

178.    Defendants published the false and defamatory statements in the Blog Post with common law malice toward Plaintiff and with the specific intent to cause damage to Project Veritas.

179.    As a result of the false and defamatory statements published by Defendants, Project Veritas' professional reputation has been impugned.

180.    As a result of the false and defamatory statements published by Defendants and Defendants' repeated refusals to correct or retract those statements, Plaintiff has been forced to make an expenditure of no less than $60,000.00 in an effort to remedy the defamation.

181.    As a result of the false and defamatory statements published by Defendants, Plaintiff has been exposed to public hatred, ridicule, and contempt.

182.    As a result of the false and defamatory statements published by Defendants, Plaintiff has suffered economic damage—including the investment of significant funds to research and produce the investigative report Defendants sought to discredit—and will suffer further economic damage.

183.    Defendants are liable for the tortious actions of their employees and agents acting within the scope and course of their employment.

184.    In view of the foregoing, Plaintiff is entitled to actual, presumed, punitive, and other damages in an amount to be specifically determined at trial.

## Second Cause of Action:

### Defamation *Per Se* for Republication of Defamatory Statements by The New York Times

185.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

186.    Defendants participated in, encouraged, and ratified the subsequent republication of the defamatory statements in the EIP Blog Post by The New York Times.

187.    On September 29, 2020, The New York Times and Times reporter Maggie Astor published on the Times' website a story with the headline, "Project Veritas Video Was a 'Coordinated Disinformation Campaign,' Researchers Say."

188.    The story was posted at the URL https://www.nytimes.com/2020/09/29/us/politics/project-veritas-ilhan-omar.html, and it remains online at that location.  A true and correct copy of the online version of the story is attached hereto as Exhibit B.

189.    The September 29 story, which was published to a worldwide audience on The Times' website, included the following false and defamatory statements:

> The timing of the deceptive video, which accuses Ilhan Omar of voter fraud, indicates that several conservatives, including Donald Trump Jr., may have known about it in advance.

> A deceptive video released on Sunday by the conservative activist James O'Keefe, which claimed through unidentified sources and with no verifiable evidence that Representative Ilhan Omar's campaign had collected ballots illegally, was probably part of a coordinated disinformation effort, according to researchers at Stanford University and the University of Washington.

190.    Also on September 29, 2020, The New York Times and Times reporter Maggie Astor published a second story on the Times' website with the headline, "Researchers say a Project Veritas video accusing Ilhan Omar of voter fraud was a 'coordinated disinformation campaign.'"

191.    The story was posted at the URL https://www.nytimes.com/2020/09/29/us/researchers-say-a-project-veritas-video-accusing-ilhan-omar-of-voter-fraud-was-a-coordinated-disinformation-campaign.html, and it remains online at that location.  A true and correct copy of the online version of the story is attached hereto as Exhibit C.

192.    This second September 29 story, which was published to a worldwide audience on The Times' website, included the following false and defamatory statements:

> The timing of the deceptive video, which accuses Ilhan Omar of voter fraud, indicates that several conservatives, including Donald Trump Jr., may have known about it in advance.

> A deceptive video released on Sunday by the conservative activist James O'Keefe, which claimed through unidentified sources and with no verifiable evidence that Representative Ilhan Omar's campaign had collected ballots illegally, was probably part of a coordinated disinformation effort, according to researchers at Stanford University and the University of Washington.

193.    On September 30, 2020, The New York Times and Maggie Astor published a third story on page A22 of the print edition of the New York Times, with the headline, "Project Veritas Releases Misleading Video, Part of What Experts Call a Coordinated Effort."

194.    A true and correct copy of the story as it appeared in the September 30, 2020 print version of The New York Times is attached hereto as Exhibit D.

195.    The September 30 print version of the story, which was published to a nationwide audience of nearly half a million people, included the following false and defamatory statements:

> Project Veritas Releases Misleading Video
>
> A deceptive video released on Saturday by the conservative activist James O'Keefe, which claimed through unidentified sources and with no verifiable evidence that Representative Ilhan Omar's campaign had collected ballots illegally, was probably part of a coordinated disinformation effort, according to researchers at Stanford University.
>
> Making claims without evidence of ballot harvesting.

196.    These statements were meant to, and in fact did, create the false and misleading impression that Project Veritas published a deceptive video news report that made claims of illegal ballot harvesting in Minnesota without any evidence and based solely on unidentified sources.

197.    These statements were reasonably understood by those reading them to be statements of fact regarding Project Veritas.

198.    As set forth herein, these statements are false.

199.    These statements are of and concerning Project Veritas.

200.    The reading public would have understood, and did understand, these statements to be of and concerning Project Veritas.

201.    Defendants are liable for the intended and foreseeable republication by The New York Times of the defamatory statements made by Defendants in the EIP Blog Post.

202.    These statements are libelous because they tend to expose Plaintiff to public contempt, ridicule, aversion, or disgrace, and to induce an evil opinion of Plaintiff in the minds of right-thinking persons, and to deprive Plaintiff of friendly intercourse in society.

203.    These statements defamed Project Veritas by falsely accusing a journalistic organization of engaging in "deception" and publishing allegations of illegal ballot harvesting "without evidence" in order to deceive and mislead viewers—a cardinal sin that is the most egregious and fundamental violation of journalistic ethics and standards, as well as of Project Veritas' own stated mission and ethical tenets.

204.    These statements are libelous *per se* because they impugn the basic integrity, ethics, and competence of Project Veritas as a journalistic organization.

205.    These statements are libelous *per se* because they would tend to harm, and indeed have harmed, Project Veritas in its trade, business, and profession, and would tend to assail, and indeed have assailed, Project Veritas' integrity and journalistic ethics.

206.    These statements are libelous *per se* because they impute unfitness in the performance of one's profession or trade to Project Veritas.

207.    As a result of The New York Times' republication of the false and defamatory statements published by Defendants, Project Veritas' professional reputation has been impugned.

208.    As a result of The New York Times' republication of the false and defamatory statements published by Defendants and Defendants' repeated refusals to correct or retract those statements, Plaintiff has been forced to make an expenditure of no less than $60,000 in an effort to remedy the defamation.

209.    As a result of The New York Times' republication of the false and defamatory statements published by Defendants, Plaintiff has been exposed to public hatred, ridicule, and

1    contempt.

2        210.    As a result of The New York Times' republication of the false and defamatory

3    statements published by Defendants, Plaintiff has suffered economic damage—including the

4    investment of significant funds to research and produce the investigative report Defendants sought

5    to discredit—and will suffer further economic damage.

6

7        211.    Defendants are liable for the tortious actions of their employees and agents acting

8    without the scope and course of their employment.

9        212.    In view of the foregoing, Plaintiff is entitled to actual, presumed, punitive, and other

10   damages in an amount to be specifically determined at trial

11                              **Third Cause of Action:**

12                              **Respondeat Superior**

13       213.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully

14   herein.

15       214.    The acts of Mr. Stamos, Ms. Cryst, and Ms. Garcia-Camargo of Stanford, and

16   Dr. Starbird, Mr. Schafer, and Dr. Bak-Coleman of the University of Washington, both in

17

18   publishing the EIP Blog Post, and in encouraging the intended and foreseeable republication of

19   the false and defamatory statements therein by The New York Times, were undertaken within the

20   scope of their employment by Defendants Stanford and the University of Washington.  These

21   tortious acts were generally foreseeable and a natural consequence of their approved activities as

22   employees and agents of Defendants.

23       215.    As a result of the tortious conduct of Mr. Stamos, Ms. Cryst, and Ms. Garcia-

24   Camargo, committed within the scope and course of their employment and agency relationships

25   with Stanford and in furtherance of the business of Stanford, Plaintiff was damaged.

26

27       216.    Defendant Stanford is liable for the torts of its employees and agents committed

within the scope of their employment and agency and in furtherance of the business of Stanford.

217.    As a result of the tortious conduct of Dr. Starbird, Mr. Schafer, and Dr. Bak-Coleman, committed within the scope and course of their employment and agency relationships with the University of Washington and in furtherance of the business of the University of Washington, Plaintiff was damaged.

218.    Defendant the University of Washington is liable for the torts of its employees and agents committed within the scope of their employment and agency and in furtherance of the business of the University of Washington.

**DEFENDANTS' CONDUCT WARRANTS PUNITIVE DAMAGES**

219.    Defendants' conduct warrants the imposition of punitive damages.  The factors justifying punitive damages include, at a minimum, the following:

    a.    Defendants knowingly made false and defamatory statements about Plaintiff;

    b.    Defendants knew that these false and defamatory statements about Plaintiff would damage Plaintiff's business, goodwill, reputation, and professional standing;

    c.    Defendants acted with a high degree of moral turpitude and wanton dishonesty in publishing these statements about Plaintiff;

    d.    Defendants intentionally ignored, purposefully avoided, and recklessly disregarded information available to them that rebutted the false statements they published about Plaintiff;

    e.    Defendants acted with knowledge that their statements were false, or with reckless disregard for the statements' truth or falsity;

    f.    Defendants published false statements about Plaintiff based on a preconceived storyline that voter fraud does not exist or is greatly exaggerated, and Defendants purposefully avoided and recklessly disregarded facts that contradicted that preconceived storyline;

    g.    Defendants published the defamatory statements about Plaintiff out of bias and ill will because Defendants disagree with what they perceive to be Plaintiff's political leanings; and

h.   Despite learning, even prior to publication of the statements at issue, that their statements about Plaintiff were and are false and defamatory, Defendants have refused to retract or correct these false statements.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor, and against Defendants Stanford University and the University of Washington, as follows:

A. One, actual, presumed, and punitive damages in excess of $75,000, in an amount to be specifically determined at trial;

B. Two, a limited, narrowly tailored injunction prohibiting the republication by Defendants of any statement adjudicated to be defamatory;

C. Three, all costs, disbursements, fees, and interest as authorized by applicable law; and

D. Four, such other and additional remedies as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 29, 2021

Respectfully Submitted,

Joel B. Ard, WSBA # 40104
Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Elizabeth M. Locke, P.C. (of counsel) (*pro hac vice* forthcoming)
Andrew C. Phillips (of counsel) (*pro hac vice* forthcoming)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: libby@clarelocke.com
Email: andy@clarelocke.com

ATTORNEYS FOR PLAINTIFF

Complaint and Jury Demand - 49

*Project Veritas v. Stanford and UW*

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110