The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PROJECT VERITAS, | Case No. 2:21-cv-01326-TSZ |
| Plaintiff, | **DEFENDANT STANFORD'S SPECIAL MOTION FOR EXPEDITED RELIEF AND DISMISSAL PURSUANT TO RCW 4.105.020** |
| v. | |
| THE LELAND STANFORD JUNIOR UNIVERSITY and THE UNIVERSITY OF WASHINGTON, | **NOTE ON MOTION CALENDAR: February 18, 2022** |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

DEFENDANT STANFORD'S SPECIAL
MOTION FOR EXPEDITED RELIEF
(Case No. 2:21-cv-01326-TSZ)

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA  98121-1128

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND........................................2

        A.      The Election Integrity Partnership ...............................................2

        B.      Project Veritas and the Video ........................................................3

        C.      The Blog Post and Media Coverage of the Video ....................5

        D.      The New York Times Litigation.....................................................6

        E.      The Complaint ..................................................................................7

III.    LEGAL STANDARD...........................................................................................7

        A.      Washington's Uniform Public Expression Protection Act .......8

        B.      Federal Rule of Civil Procedure 12(b)(6) ..............................10

        C.      Request for Judicial Notice ........................................................11

IV.     PLAINTIFF'S CLAIMS ARISE FROM CONDUCT PROTECTED BY UPEPA .........11

V.      PLAINTIFF DOES NOT AND CANNOT STATE A CAUSE OF ACTION FOR
        DEFAMATION BASED ON THE BLOG POST........................................12

        A.      Plaintiff Does Not and Cannot Plead Falsity ..........................12

                1.      "Right-Wing"....................................................................13

                2.      "Using Misleading or Inaccurate Information" .........13

                3.      "Debunked".......................................................................15

                4.      "Without Any Factual Support"....................................15

                5.      "Coordinated Elite Disinformation Campaign"..........16

        B.      Plaintiff Does Not and Cannot Plead Fault.............................17

VI.     PLAINTIFF DOES NOT AND CANNOT STATE A CAUSE OF ACTION FOR
        DEFAMATION BASED ON THE TIMES ARTICLES ..................................19

VII.    PLAINTIFF DOES NOT AND CANNOT STATE A CAUSE OF ACTION FOR
        RESPONDEAT SUPERIOR ........................................................................20

VIII.   CONCLUSION....................................................................................................20

DEFENDANT STANFORD'S SPECIAL
MOTION FOR EXPEDITED RELIEF – i
(Case No. 2:21-cv-01326-TSZ)

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA 98121

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Akhtar v. Mesa*,
   698 F.3d 1202 (9th Cir. 2012) ......................................................................... 10

*AR Pillow Inc. v. Maxwell Payton, LLC*,
   No. C11-1962 RAJ, 2012 WL 6024765 (W.D. Wash. Dec. 4, 2012) ................... 10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................ 10, 17, 18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)......................................................................................... 10

*Bigelow v. Nw. Tr. Servs., Inc.*,
   No. C14-5798 BHS, 2015 WL 4394926 (W.D. Wash. July 16, 2015), *vacated
   based on Davis v. Cox*, 2015 WL 5124097 (W.D. Wash. Aug. 31, 2015) ........... 10

*Bose Corp. v. Consumers Union of U.S., Inc.*,
   466 U.S. 485 (1984).......................................................................................... 18

*Camer v. Seattle Post–Intelligencer*,
   45 Wn. App. 29 (1986) ..................................................................................... 12

*Caruso v. Loc. Union No. 690 of Int'l Bhd. of Teamsters*,
   100 Wn.2d 343 (1983) ...................................................................................... 17

*Castello v. City of Seattle*,
   No. C10-1457 MJP, 2010 WL 4857022 (W.D. Wash. Nov. 22, 2010)................. 10

*CoreCivic Inc. v. Candide Grp. LLC*,
   No. C-20-03792-WHA, 2021 WL 1267259 (N.D. Cal. Apr. 6, 2021) ................... 9

*Davis v. Avvo, Inc.*,
   No. C11-1571-RSM, 2012 WL 1067640 (W.D. Wash. Mar. 28, 2012)................. 10

*Davis v. Cox*,
   183 Wn.2d 269 (2015) ...................................................................................... 10

*Duc Tan v. Le*,
   177 Wn.2d 649 (2013) ...................................................................................... 12

*Dunlap v. Wayne*,
    105 Wn.2d 529 (1986) ........................................................................................................ 13

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) .......................................................................................................... 17

*Hanna v. Plumer*,
    380 U.S. 460 (1965) ............................................................................................................ 8

*Harris v. City of Seattle*,
    315 F. Supp. 2d 1105 (W.D. Wash. 2004), *aff'd*, 152 F. App'x 565 (9th Cir. 2005) ............. 17

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ..................................................................................................... 18, 19

*Herron v. Trib. Pub. Co.*,
    108 Wn.2d 162 (1987) ...................................................................................................... 18

*Kahl v. Bureau of Nat'l Affs., Inc.*,
    856 F.3d 106 (D.C. Cir. 2017) .......................................................................................... 18

*Khoja v. Orexigen Therapeutics, Inc.*,
    *899 F.3d 988 (9th Cir. 2018)* ............................................................................................. 4

*Leadsinger, Inc. v. BMG Music Pub.*,
    512 F.3d 522 (9th Cir. 2008) ............................................................................................ 11

*Lindsay v. Carnival Corp.*,
    No. 20-cv-982-TSZ, 2021 WL 488994 (W.D. Wash. Feb. 10, 2021) ..................................... 10

*Makaeff v. Trump Univ., LLC*,
    736 F.3d 1180 (9th Cir. 2013) ............................................................................................. 9

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) .......................................................................................................... 17

*McCabe v. Rattiner*,
    814 F.2d 839 (1st Cir. 1987) ............................................................................................. 14

*Miller v. Watson*,
    No. 3:18-CV-00562-SB, 2019 WL 1871011 (D. Or. Feb. 12, 2019), *rep. and rec.*
    *adopted*, No. 3:18-CV-00562-SB, 2019 WL 1867922 (D. Or. Apr. 25, 2019) ..................... 18

*New York Studio, Inc. v. Better Bus. Bureau of Alaska, Oregon, & W. Washington*,
    No. 3:11-CV-05012 RBL, 2011 WL 2414452 (W.D. Wash. June 13, 2011) ........................ 10

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ........................................................................................ 12, 17

*Orwick v. Fox*,
  65 Wn. App. 71 (1992) ............................................................................................ 20

*Paterson v. Little, Brown & Co.*,
  502 F. Supp. 2d 1124 (W.D. Wash. 2007) ..................................................... passim

*Peterson v. Gannett Co. Inc.*,
  No. CV-20-00106-PHX-MTL, 2020 WL 1935520 (D. Ariz. Apr. 22, 2020) ....................... 17

*Phantom Touring, Inc. v. Affiliated Publications*,
  953 F.2d 724 (1st Cir. 1992) .................................................................................. 14

*Philadelphia Newspapers, Inc. v. Hepps*,
  475 U.S. 767 (1986) ............................................................................................ 1, 12

*Phoenix Trading, Inc. v. Kayser*,
  No. C10-0920-JLR, 2011 WL 3158416 (W.D. Wash. July 25, 2011) ................... 10

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
  890 F.3d 828 (9th Cir. 2018) ............................................................................. 9, 10

*Resolute Forest Prod., Inc. v. Greenpeace Int'l*,
  302 F. Supp. 3d 1005 (N.D. Cal. 2017) ..................................................... 17, 18, 19

*REX - Real Est. Exch., Inc. v. Zillow, Inc.*,
  No. C21-312 TSZ, 2021 WL 5998419 (W.D. Wash. Dec. 20, 2021) ............... 10, 12

*Robel v. Roundup Corp.*,
  148 Wn.2d 35 (2002) .............................................................................................. 13

*Sager v. Adamson*,
  No. C08-5463 FDB, 2008 WL 4181599 (W.D. Wash. Sept. 8, 2008) ................... 20

*Sarver v. Chartier*,
  813 F.3d 891 (9th Cir. 2016) ................................................................................... 9

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*,
  559 U.S. 393 (2010) ........................................................................................... 9, 10

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ................................................................................... 7

*Tilden-Coil Constructors, Inc. v. Landmark Am. Ins. Co.*,
    721 F. Supp. 2d 1007 (W.D. Wash. 2010) ................................................................. 8

*Tull v. Higgins*,
    No. 21-CV-01566-DMR, 2021 WL 6116971 (N.D. Cal. Dec. 27, 2021) ............... 17

*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*,
    190 F.3d 963 (9th Cir. 1999) ...................................................................................... 9

*Ward v. Painters' Local Union No. 300*,
    41 Wn.2d 859 (1953) ................................................................................................. 12

*Wilcox v. Basehore*,
    187 Wn.2d 772 (2017) ............................................................................................... 20

*Wynn v. Chanos*,
    75 F. Supp. 3d 1228 (N.D. Cal. 2014) ........................................................... 17, 18, 19

<u>Statutes and Rules</u>

Federal Rules of Civil Procedure
    Rule 12(b)(6)....................................................................................................... 10, 11
    Rule 56 ....................................................................................................................... 10

Federal Rules of Evidence
    Rule 201 ..................................................................................................................... 11

Local Civil Rules
    Rule 7(e)(3) ................................................................................................................ 11

Revised Code of Washington
    Section 4.105.010 *et seq.* ...................................................................................... passim

United States Code
    Title 28 Section 1332 .................................................................................................. 7

<u>Other Authorities</u>

2021 Wash. S. B. No. 5009, Wash. 67th Leg., 2021 Reg. Sess. .................................... 8

Restatement (Second) of Torts Section 576 .................................................................. 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

1   Defendant The Board of Trustees of the Leland Stanford Junior University ("Stanford")

2   hereby moves this Court to dismiss, with prejudice, all claims asserted against Stanford in

3   Plaintiff Project Veritas' Complaint filed September 29, 2021 (Dkt. 1) ("Compl.").  This motion

4   is made under Washington's Uniform Public Expression Protection Act, RCW 4.105.010 *et seq*.

5   **I.      INTRODUCTION**

6   Plaintiff Project Veritas alleges that it was defamed by an academic blog post (the "Blog

7   Post") (Compl. Ex. A) published by researchers from Stanford and The University of

8   Washington calling out the shortcomings of a Project Veritas video (the "Video") (Compl. ¶ 57

9   n.11) purportedly uncovering "one of the biggest voter fraud schemes in American history."  But

10  the Complaint does not and cannot state a claim for defamation and should be dismissed under

11  Washington's recently enacted Uniform Public Expression Protection Act, which broadly

12  protects speech on matters of public concern from meritless civil litigation.

13  As this action targets speech defending the "legitimacy of the political process," it runs

14  headlong into "the restrictions that the First Amendment places upon the common law of

15  defamation."  *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 778 (1986).  Specifically,

16  the challenged speech must be false and made with actual malice to be actionable.  Looking only

17  at the Complaint and matters properly subject to judicial notice, however, it is clear that Project

18  Veritas does not and cannot allege that the Blog Post was either false or malicious.

19  The Blog Post was not false because its content was either substantially true or non-

20  actionable opinion.  For example, Project Veritas challenges the Blog Post's charge that the

21  Video used "misleading" information, but the term "misleading" is non-actionable opinion

22  because it is not susceptible to a simple answer of true or false.  Further, to the extent it is

23  susceptible to such an answer, it is true given the Video's failure to deliver on Project Veritas'

24  promise of "UNDENIABLE VIDEO PROOF OF SYSTEMIC VOTER FRAUD."  As for actual

25  malice, the Complaint fails to offer a single plausible allegation supporting the necessary

26

DEFENDANT STANFORD'S SPECIAL
MOTION FOR EXPEDITED RELIEF – 1
(Case No. 2:21-cv-01326-TSZ)

showing that the academics behind the Blog Post "in fact entertained serious doubts as to [its] truth." *Paterson v. Little, Brown & Co.*, 502 F. Supp. 2d 1124, 1143 (W.D. Wash. 2007).

Accordingly, Stanford respectfully requests that this Court grant its motion and dismiss Plaintiff's claims against it with prejudice.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Election Integrity Partnership

The Election Integrity Partnership (the "EIP") is a coalition of research entities devoted to detecting election-related disinformation.  Compl. ¶ 31.  Stanford is a foundational partner of the EIP through the Stanford Internet Observatory, part of Stanford's Freeman Spogli Institute of International Studies.  *Id*. ¶ 11.  Defendant The University of Washington ("UW") is also a foundational partner of the EIP through the University of Washington Center for an Informed Public.  *Id*. ¶ 15.  In a July 27, 2020 post on the EIP website announcing the partnership's formation, the EIP explained its purpose and mission as follows:

> The Election Integrity Partnership is a coalition of research entities focused on supporting real-time information exchange between the research community, election officials, government agencies, civil society organizations, and social media platforms.  Our objective is to detect and mitigate the impact of attempts to prevent or deter people from voting or to delegitimize election results.  This is not a fact-checking partnership to debunk misinformation more generally: our objective explicitly excludes addressing comments that may be made about candidates' character or actions and is focused narrowly on content intended to suppress voting, reduce participation, confuse voters as to election processes, or delegitimize election results without evidence.

Declaration of Lee Brand ("Brand Decl.") Ex. 1 at 1.

The EIP's work during the 2020 election was widely covered by journalists, including reporters from the Associated Press, Bloomberg News, The Detroit Free Press, National Public Radio, The New York Times, Reuters, Voice of America, The Wall Street Journal, and The Washington Post.  *Id*. ¶ 21.  This work included addressing false and misleading narratives that favored the interests of both the political right and the political left.  For example, the very same day as the challenged Blog Post about Project Veritas, the EIP published another post addressing emerging narratives about mail dumping and election integrity.  *Id*. Ex. 2.  This post explained

that recent incidents of mail dumping had "spawned a couple of competing narratives, one that aligned with the right-wing narratives to foment distrust in voting by mail, and another that resonated on the political left with previous criticisms of the Trump administration's management of the U.S. Postal Service." *Id*. at 2.  The post went on to describe both of these narratives "as a kind of *disinformation* — i.e., false or misleading information, intentionally seeded and/or spread to achieve a political objective." *Id*.[1]

### B.   Project Veritas and the Video

Plaintiff Project Veritas was founded in 2011 by James O'Keefe, who serves as its President, Chief Executive Officer, and Chairman of its Board of Directors.  Compl. ¶ 10.  Project Veritas variously describes itself as "a not-for-profit journalism enterprise" and a "band of 'guerilla journalists.'" *Id*. ¶¶ 23, 25.  It has frequently been described in the media as "a right-wing activist group." *See, e.g.*, Ex. 4 (*Forbes*) at 2.

As reported in the Blog Post, and not challenged by the Complaint, on September 24, 2020, Mr. O'Keefe tweeted that Project Veritas would soon be releasing "UNDENIABLE VIDEO PROOF OF SYSTEMIC VOTER FRAUD."  Compl. Ex. A at 1.  Later that same day, Project Veritas' official Twitter account tweeted that it would soon be releasing an "explosive video on voter fraud." *Id*. at 2 (Fig. 2).  On September 26, 2020, Project Veritas tweeted that it had "obtained undeniable video proof of systemic voter fraud." *Id*.  On September 27, 2020, Mike Lindell, CEO of My Pillow, Inc. and then chair of the Minnesota Trump Campaign tweeted: "The days of calling voter fraud a 'myth' are officially over.  TONIGHT.  9PM.  See it first ---> Ballot-Harvesting.com #BallotHarvesting." *Id*.  In a video accompanying the tweet, Mr. Lindell reported that he "just met James O'Keefe with Project Veritas and James showed me footage of systematic voter fraud going on." *Id*. at 3 (Image 1).  Later that day, Project Veritas

---

[1] *See also* Ex. 3 at 1-2, 9-10 (October 23, 2020 blog post addressing emails, purportedly from the rightwing hate group the Proud Boys, that warned registered Democrats that the Proud Boys "will know which candidate you voted for" based on hacked voter information and to "[v]ote for Trump or else!"; the EIP concluded that "[t]hese intimidating emails were not sent by the Proud Boys" and explained that the US government had attributed this activity to the Islamic Republic of Iran).

tweeted: "Its almost time to break the internet #BallotHarvesting;" *id*. at 2 (Fig. 2); and ultimately released the Video titled "Ilhan Omar Connected Cash-For-Ballots Voter Fraud Scheme Corrupts Elections" on its website and social media platforms.  Compl. ¶¶ 57-58 & n.11. Seven minutes after Mr. O'Keefe first made a "BREAKING" post on social media to share the Video, it was also shared by Donald Trump Jr.  Compl. Ex. A at 5-6.[2]

The Video purportedly depicts Liban Mohamed illegally collecting absentee ballots, or "ballot harvesting," on behalf of his brother Jamal Osman, a 2020 candidate for Minneapolis City Council.  Compl. ¶¶ 59-66.  The Video's other "primary on-the-record source" is Omar Jamal, who states that "I think" Liban Mohamed also worked for U.S. Representative Ilhan Omar.  *Id*. ¶ 70; Video at 1:57-2:04.[3]  Omar Jamal further states that another man, Alli Isse Gainey, was known to offer cash for votes for Rep. Omar.  *Id*. ¶ 77.  The Video also includes several anonymous sources, *id*. ¶¶ 67, 74-76; as well as a recording of AJ Awed, who lost to Jamal Osman in the 2020 Minneapolis City Council election, vaguely alleging "corruption" in Minneapolis elections, *id*. ¶ 78.

Mr. O'Keefe is also featured prominently in the Video and makes a number of statements within it, including the following:

- Rep. Omar "and her campaign may be behind one of the biggest voter fraud schemes in American history."  Video at 7:51-8:04.

- "Sources say that Ilhan Omar is actually exploiting members of her own Somali community."  *Id*. at 9:33-9:45.

---

[2] The Twitter accounts of Mr. Lindell, Mr. O'Keefe, and Project Veritas have all since been suspended.  Ex. 5.
[3] The Complaint incorporates the Video by reference.  *See* Comp. ¶ 57 n.11 (linking to the Video on Project Veritas' website: https://www.projectveritas.com/news/ilhan-omar-connected-cash-for-ballots-voter-fraud-scheme-corrupts-elections/); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) ("incorporation-by-reference . . . prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims").  Video cites herein reflect the time of the cited statements in the Video as viewed at the link provided in the Complaint.

DEFENDANT STANFORD'S SPECIAL
MOTION FOR EXPEDITED RELIEF – 4
(Case No. 2:21-cv-01326-TSZ)

- "Sources say that Ilhan Omar's voter fraud machine appears to be much more than just a few foot soldiers like Liban Mohamed's ballot harvesting.  This appears to be an effort that is very systemic and very coordinated."  *Id*. at 12:17-12:30.

### C.    The Blog Post and Media Coverage of the Video

On September 28 and 29, 2020, prior to the publication of the challenged Blog Post, multiple national and local media sources published reports questioning various aspects of the Video.  On the national level, *Forbes* described the Video as "an unsubstantiated report from Project Veritas — a right-wing activist group that has a track record of publishing misleading stories — that claimed Rep. Ilhan Omar (D-Minn.) was connected to a cash-for-ballots harvesting scheme."  Brand Decl. Ex. 4 at 2.  *Newsweek* stated that the Video's "cash for ballots accusation is unsubstantiated at this time."  *Id*. Ex. 6 at 3.  The *Daily Dot* reported that the Video "both decontextualizes what happened and fails to verify its sources," and that Omar Jamal—one of the Video's primary sources—had a "questionable past as a faux spokesperson for the Somali community in Minnesota."  *Id*. Ex. 7 at 1-2.

Similarly, a local report from *Fox 9 KMSP* stated that "hard evidence of cash in exchange for votes was lacking."  *Id*. Ex. 8 at 1.  *CBS Minnesota* reported that Representative Omar had released a statement saying there is "zero truth to the Project Veritas claims," and that Mr. Jamal had "launched a GoFundMe on his own behalf" and "had already raised more than $25,000."  *Id*. Ex. 9 at 2-3.  *Sahan Journal* found it "safe to say that there isn't any solid evidence of wrongdoing" and that "Project Veritas' report presents only the word of a few sources, most of whom are anonymous, and a few videos from Snapchat, none of which clearly show fraudulent ballots."  *Id*. Ex. 10 at 12.  The *Minnesota Reformer* reported that City Council Member Jamal Osman had also released a statement "denying the allegations."  *Id*. Ex. 11 at 2.

On September 29, 2020, the EIP published the Blog Post titled "Project Veritas #BallotHarvesting Amplification."  Compl. ¶¶ 81, 153 & Ex. A.  The Blog Post was primarily focused on "whether and how prominent conservatives had worked to promote and 'aggressively

spread'" the Video. *Id.* ¶ 82; *see also id.* Ex. A at 1 ("This post will explore the timeline of how the ideas in this video were initially seeded and then aggressively spread."). As discussed above, the Blog Post explored the "Pre-Amplification" of the Video prior to its release by Mr. O'Keefe, Mr. Lindell, and Project Veritas, and the "Early Amplification" upon its release "driven by Blue-Check influencers" like Donald Trump Jr. *Id.* Ex. A.[4] It also included multiple graphs to demonstrate how the Video achieved virality through "elite disinformation, or the key role of verified influencers in propagating the chosen narrative early on." *Id.* at 1 (Fig. 1). The Blog Post ultimately drew several conclusions, including that the Video was "a good example of the ability of a small number of coordinated political influencers to drive the narrative on a platform such as Twitter or Facebook and to generate millions of impressions for a single video." *Id.* at 6.

Thereafter, national and local media reports continued to question the Video. For example, *Sahan Journal* published an article stating that Omar Jamal appeared on Somali American TV and "contradicted claims he made" in the Video. *Id.* Ex. 12 at 1. In addition, *Fox 9 KMSP* identified Liban Osman as challenging the Video, including because he had been offered money by Omar Jamal to state falsely that he had been collecting ballots for Rep. Omar and because video clips of him had been deceptively edited together. *Id.* Ex. 13 at 1-2. And *USA Today* published an article titled "Fact Check: No Proof of Alleged Voter Fraud Scheme or Connection to Rep. Ilhan Omar," which concluded that "the claim that Project Veritas discovered a voter fraud scheme connected to Rep. Ilhan Omar is FALSE." *Id.* Ex. 14 at 5.

## D.    The New York Times Litigation

On September 29 and 30, 2020, *The New York Times* published two online versions and one print version of an article discussing the Video and the Blog Post (the "Times Articles"). Compl. ¶¶ 104-10, 187-95, Exs. B-D. On November 2, 2020, Project Veritas, represented by the same outside counsel as in this litigation, filed a complaint in state court in Westchester County, New York against the Times and two of its reporters (the "Times Action"). *Id.* Ex. 15. The

---

[4] "Blue check" refers to the image that appears where Twitter has verified the identity of a prominent user.

complaint in the Times Action alleges defamation based on the same Times Articles.  *Id.* ¶¶ 184-86, 214-16, 244-46.  It also alleges defamation based on the print and online versions of a subsequent article published by the Times on October 25 and 26, 2020 that mentioned Project Veritas and the Video.  *Id.* ¶¶ 274-76, 305-06.[5]

The Times filed a motion to dismiss the Times Action pursuant to New York's anti-SLAPP statute, which the trial court denied on March 18, 2021.  *Id.* Ex. 16.  The Times appealed the trial court's order and moved the Appellate Division for a stay of discovery pending resolution of the appeal, which the Appellate Division granted on November 23, 2021.  Ex. 17.

**E.    The Complaint**

The Complaint asserts three causes of action against Defendants Stanford and UW: (1) Defamation *Per Se* for Publication of the September 29, 2020 Blog Post; (2) Defamation *Per Se* for Republication of Defamatory Statements by The New York Times; and (3) Respondeat Superior.  Compl. ¶¶ 151-218.  Plaintiff pleads subject matter jurisdiction over these state law claims based on diversity jurisdiction under 28 U.S.C. § 1332.  *Id.* ¶ 19.  Project Veritas' defamation claim challenges the following language from the Blog Post:

> On Sunday night, a right-wing activist group, Project Veritas, released a video alleging illegal ballot harvesting in Minnesota.  The video made several falsifiable claims that have either been debunked by subsequent reporting or are without any factual support.  As the video calls into question the integrity of the election using misleading or inaccurate information, we determined this video to be a form of election disinformation.  While we have reported our findings to the relevant online platforms, this video stands as an interesting example of what a domestic, coordinated elite disinformation campaign looks like in the United States.

Compl. ¶ 154 & Ex. A at 1.

**III.   LEGAL STANDARD**

Where a federal court sits in diversity to adjudicate state law claims, it must follow state substantive law and federal procedural law.  *See, e.g., Sonner v. Premier Nutrition Corp.*, 971

---

[5] This article more broadly discussed how multiple "'right-leaning news sites' have been publishing 'false or misleading headlines and articles' designed to back claims by President Trump that 'mail-in ballots threaten the integrity of the election.'"  *Id.* ¶ 150 (quoting article).

1  F.3d 834, 839 (9th Cir. 2020) (citing *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)).  "Washington

2  [substantive] law presumptively applies" absent an "actual conflict between the laws or interests

3  of Washington and the laws or interests of another state."  *Tilden-Coil Constructors, Inc. v.*

4  *Landmark Am. Ins. Co.*, 721 F. Supp. 2d 1007, 1012-13 (W.D. Wash. 2010).

5        **A.**      **Washington's Uniform Public Expression Protection Act**

6        Washington recently enacted the Uniform Public Expression Protection Act ("UPEPA"),

7  RCW 4.105.010 *et seq.*, an anti-SLAPP statute.[6]  Under UPEPA, a defendant "may file a special

8  motion for expedited relief to dismiss the cause of action or part of the cause of action."  RCW

9  4.105.020.  Pursuant to such a motion, "the court shall dismiss with prejudice a cause of action,

10  or part of a cause of action, if:

11      (a) The moving party establishes under RCW 4.105.010(2) that this chapter applies;

12      (b) The responding party fails to establish under RCW 4.105.010(3) that this chapter does
    not apply; and

13      (c) . . . (ii) The moving party establishes that: (A) The responding party failed to state a
14      cause of action upon which relief can be granted; . . .

15  RCW 4.105.060(1).  Under RCW 4.105.010, UPEPA generally applies to any state law "cause of

16  action asserted in a civil action" that is based on any of a number of protected communications,

17  including "[e]xercise of the right of freedom of speech . . . on a matter of public concern."  If the

18  moving party prevails, the court must also award costs, attorneys' fees, and litigation expenses

19  related to the motion.  RCW 4.105.090.  In addition, UPEPA "must be broadly construed and

20  applied to protect the exercise of the right of freedom of speech and of the press, the right to

21  assemble and petition, and the right of association, guaranteed by the United States Constitution

22   

_____

[6] *See* UPEPA Legislative History, 2021 Wash. S. B. No. 5009, Wash. 67th Leg., 2021 Reg. Sess. ("The Legislature
23  has previously found [in connection with Washington's 2010 anti-SLAPP statute] that strategic lawsuits against
public participation (SLAPP) are brought primarily to chill the valid exercise of the constitutional rights of freedom
24  of speech and petition for the redress of grievances; that SLAPP claims are typically dismissed as groundless or
unconstitutional, but often not before the defendants are put to great expense, harassment, and interruption of their
25  productive activities; and that the costs associated with defending such suits can deter individuals and entities from
fully exercising their constitutional rights to petition the government and to speak out on public issues. . . .
26  [Comments in support:] . . . This is an important protection from abusive defamation lawsuits, which have a chilling
effect on reporting.").

1  or the Washington state Constitution." RCW 4.105.901. The statute applies to civil actions, like

2  this one, filed "on or after July 25, 2021." RCW 4.105.903.

3       Under Ninth Circuit law, a statute authorizing an anti-SLAPP motion is a substantive

4  state law that applies in federal court. *See, e.g.*, *Planned Parenthood Fed'n of Am., Inc. v. Ctr.*

5  *for Med. Progress*, 890 F.3d 828, 833 (9th Cir. 2018) (acknowledging that whether "anti-SLAPP

6  provisions are consistent with the Federal Rules of Civil Procedure has been hotly disputed," but

7  concluding anti-SLAPP motions are available in federal court); *Sarver v. Chartier*, 813 F.3d 891,

8  899-900 (9th Cir. 2016) (applying California rather than New Jersey substantive law in part

9  because "California would appear to object strongly to the absence of a robust anti-SLAPP

10  regime"); *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972-73 (9th

11  Cir. 1999) ("California has articulated the important, substantive state interests furthered by the

12  Anti-SLAPP statute" and "[w]e fail to see how the prior application of the anti-SLAPP

13  provisions will directly interfere with the operation of Rule 8, 12, or 56.").

14       Plaintiff has asked the Court to ignore this Ninth Circuit precedent based on the Supreme

15  Court's ruling in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S.

16  393 (2010). *See* Dkt. 33. A federal district court within the Ninth Circuit recently declined the

17  same invitation from the same counsel representing Project Veritas here. *See CoreCivic Inc. v.*

18  *Candide Grp. LLC*, No. C-20-03792-WHA, 2021 WL 1267259, at *5 (N.D. Cal. Apr. 6, 2021)

19  ("Given that our own court of appeals has blessed application of California's anti-SLAPP

20  statute" in *Planned Parenthood*, "it would be impermissible for a district court to . . . invalidate[]

21  the entirety of the California anti-SLAPP statute in federal court" based on the Second Circuit's

22  interpretation of *Shady Grove*); *see also Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1181-82

23  (9th Cir. 2013) (JJ. Wardlaw, Callahan, Fletcher & Gould concurring in denial of rehearing en

24  banc) (finding the "Supreme Court's decision in *Shady Grove* . . . does not change this

25  reasoning" from *Newsham* because an "anti-SLAPP statute, by creating a separate and additional

26

1   theory upon which certain kinds of suits may be disposed of before trial, supplements rather than

2   conflicts with the Federal Rules").[7]

3       Where, as here, an anti-SLAPP motion filed in federal court "challenges only the legal

4   sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6)

5   standard and consider whether a claim is properly stated." *Planned Parenthood*, 890 F.3d at

6   834.  It is only when the motion "challenges the factual sufficiency of a claim" that "the Federal

7   Rule of Civil Procedure 56 standard will apply" and "discovery must be allowed." *Id*.

8       **B.    Federal Rule of Civil Procedure 12(b)(6)**

9       "On a motion to dismiss, courts 'consider only allegations contained in the pleadings,

10  exhibits attached to the complaint, and matters properly subject to judicial notice.'" *Lindsay v.*

11  *Carnival Corp.*, No. 20-cv-982-TSZ, 2021 WL 488994, at *2 (W.D. Wash. Feb. 10, 2021)

12  (quoting *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012)).  "The question for the Court is

13  whether the facts in the complaint sufficiently state a 'plausible' ground for relief." *REX - Real*

14  *Est. Exch., Inc. v. Zillow, Inc.*, No. C21-312 TSZ, 2021 WL 5998419, at *2 (W.D. Wash. Dec.

15  20, 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility is

16  established not by "'labels and conclusions'" or "'a formulaic recitation of the elements of a

17  cause of action,'" but rather by "sufficient factual matter" that is more than "'merely consistent

18  with' a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*,

19  550 U.S. at 555, 557).  Where a complaint fails to meet this standard, "such deficiency should be

20  'exposed at the point of minimum expenditure of time and money by the parties and the court.'"

21  *REX*, 2021 WL 5998419, at *2 (quoting *Twombly*, 550 U.S. at 558).

22  _____

23  [7] After *Shady Grove*, and before Washington's prior anti-SLAPP statute was invalidated for unrelated reasons by *Davis v. Cox*, 183 Wn.2d 269 (2015), the Western District of Washington repeatedly granted anti-SLAPP motions.

24  *See, e.g., Bigelow v. Nw. Tr. Servs., Inc.*, No. C14-5798 BHS, 2015 WL 4394926, at *2 (W.D. Wash. July 16, 2015), *vacated based on Davis v. Cox*, 2015 WL 5124097 (W.D. Wash. Aug. 31, 2015); *AR Pillow Inc. v. Maxwell Payton, LLC*, No. C11-1962 RAJ, 2012 WL 6024765, at *7 (W.D. Wash. Dec. 4, 2012); *Davis v. Avvo, Inc.*, No. C11-1571-

25  RSM, 2012 WL 1067640, at *8 (W.D. Wash. Mar. 28, 2012); *Phoenix Trading, Inc. v. Kayser*, No. C10-0920-JLR, 2011 WL 3158416, at *15 (W.D. Wash. July 25, 2011); *New York Studio, Inc. v. Better Bus. Bureau of Alaska,*

26  *Oregon, & W. Washington*, No. 3:11-CV-05012 RBL, 2011 WL 2414452, at *8 (W.D. Wash. June 13, 2011); *Castello v. City of Seattle*, No. C10-1457 MJP, 2010 WL 4857022, at *13 (W.D. Wash. Nov. 22, 2010).

To the extent that this Court determines for any reason that a motion under UPEPA is unavailable in federal court, Stanford requests that it apply Rule 12(b)(6) directly to reach the same result—*i.e.*, that the Complaint should be dismissed with prejudice because Plaintiff does not and cannot state a claim. *See, e.g., Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (dismissal with prejudice appropriate where amendment would be futile). In that event, Stanford joins in UW's Motion to Dismiss under Rule 12 to the extent it relates to the allegations against Stanford.

## C.    Request for Judicial Notice

Under the Federal Rules of Evidence, the Court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also id.* 201(c) ("The court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information."). The blog posts, news articles, websites, and legal filings described in the Brand Declaration are all publicly available documents, the contents of which are not subject to reasonable dispute. Stanford includes an Appendix herewith further specifying the basis for judicial notice for these materials. The combined brief and Appendix remain within the twenty-four-page limit for this motion set by Local Civil Rule 7(e)(3).

## IV.    PLAINTIFF'S CLAIMS ARISE FROM CONDUCT PROTECTED BY UPEPA

Plaintiffs' claims against Stanford plainly fall within UPEPA's comprehensive protection of constitutional free speech. Except in certain enumerated circumstances, all inapplicable here, UPEPA broadly "applies to a cause of action asserted in a civil action against a person based on the person's . . . [e]xercise of the right of freedom of speech . . . on a matter of public concern." RCW 4.105.010(2); *see also* RCW 4.105.010(1)(c) ("'Person' means an individual, estate, trust, partnership, business or nonprofit entity, governmental unit, or other legal entity."). Plaintiff's claims are all based on Stanford's role in the publication and dissemination of the Blog Post, which addresses a matter of public concern. Indeed, the speech at issue "concerns the legitimacy

of the political process, and therefore clearly 'matters.'" *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 778 (1986) (discussing "the restrictions that the First Amendment places upon the common law of defamation . . . [t]o provide 'breathing space' . . . for true speech on matters of public concern" (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964))).

## V.   PLAINTIFF DOES NOT AND CANNOT STATE A CAUSE OF ACTION FOR DEFAMATION BASED ON THE BLOG POST

Defamation requires four elements under Washington law: "(1) a false statement, (2) publication, (3) fault, and (4) damages." *REX*, 2021 WL 5998419, at *3 (W.D. Wash. Dec. 20, 2021) (citing *Duc Tan v. Le*, 177 Wn.2d 649, 662 (2013)). Here, it is clear Project Veritas' claim for defamation based on the Blog Post does not and cannot "state a cause of action upon which relief can be granted." RCW 4.105.060(1)(c)(ii)(A). Project Veritas does not and cannot plead falsity because the challenged statements are either substantially true or non-actionable statements of opinion, and it does not and cannot plead fault because the challenged statements were not made with actual malice.

### A.   Plaintiff Does Not and Cannot Plead Falsity

"[T]ruth is an absolute defense to a claim of defamation." *Paterson v. Little, Brown & Co.*, 502 F. Supp. 2d 1124, 1133 (W.D. Wash. 2007) (citing *Ward v. Painters' Local Union No. 300*, 41 Wn.2d 859, 865 (1953)). Moreover, the relevant standard for truth is not "'the literal truth of every claimed defamatory statement'" but rather "'that the statement is substantially true or that the gist of the story, the portion that carries the "sting," is true.'" *Id.* (quoting *Camer v. Seattle Post–Intelligencer*, 45 Wn. App. 29, 38 (1986)).

However, as "a threshold determination, the Court must determine whether the allegedly defamatory words were intended as a statement of fact or an expression of opinion." *Id.* (citing *Camer*, 45 Wn. App. at 39). "In considering whether statements should be taken literally as statements of fact, or as opinion, the Court must consider the 'totality of the circumstances' surrounding those statements," including "at a minimum, the medium and context, the audience,

1 and whether the statement implies 'undisclosed facts.'" *Id*. (quoting *Robel v. Roundup Corp.*,

2 148 Wn.2d 35, 56 (2002)).

3     Project Veritas only challenges the first four sentences of the Blog Post as defamatory:

4     On Sunday night, a right-wing activist group, Project Veritas, released a video alleging

5 illegal ballot harvesting in Minnesota.  The video made several falsifiable claims that
have either been debunked by subsequent reporting or are without any factual support.

6 As the video calls into question the integrity of the election using misleading or
inaccurate information, we determined this video to be a form of election disinformation.

7 While we have reported our findings to the relevant online platforms, this video stands as
an interesting example of what a domestic, coordinated elite disinformation campaign

8 looks like in the United States.

9 Compl. ¶ 154 & Ex. A.  Its fifth sentence, which concludes this introductory paragraph, further

10 explains: "This post will explore the timeline of how the ideas in this video were initially seeded

11 and then aggressively spread."  *Id*. Ex. A at 1.  The Complaint acknowledges that the rest ("[t]he

12 majority") of the Blog Post is "a technical study" of how the Video was circulated and promoted

13 within conservative circles and it does not allege that any aspect of that study was false.  *Id*. ¶ 82.

14 The challenged language—comprising less than one paragraph of the six-page Blog Post, *id*. Ex.

15 A—must be read in the context of this otherwise unchallenged study.  Even considered word by

16 word, however, the language at issue is either substantially true or non-actionable opinion.

17     **1.**    **"Right-Wing"**

18     The description of Project Veritas in the Blog Post's first sentence as a "right-wing

19 activist group" is plainly opinion and is basically consistent with Project Veritas's description of

20 itself.  *See* Compl. ¶¶ 23-27; Brand Ex. 18 ([projectveritas.com/about/](projectveritas.com/about/)).  It is also a label that had

21 been frequently applied to Project Veritas prior to the Blog Post, *see, e.g.,*  Ex. 4 at 2; and that

22 Project Veritas does not appear to dispute in the Complaint.

23     **2.**    **"Using Misleading or Inaccurate Information"**

24     Similarly, in describing the Video as "using misleading or inaccurate information,"

25 particularly given the inherently political context of the issue, the Blog Post's third sentence

26 expressed non-actionable opinion.  *See, e.g., Dunlap v. Wayne*, 105 Wn.2d 529, 539 (1986)

(statements of opinion expected in the context of "political debates" and other "ongoing public debates").  The Blog Post does not state that any single statement in the Video is necessarily inaccurate, only that several claims in the Video are either inaccurate *or* misleading.  And whether or not the style of political reporting showcased by Project Veritas in the Video is "misleading" in certain instances is simply not susceptible to a simple answer of true or false.  *See, e.g., Paterson*, 502 F. Supp. 2d at 1135 ("'The lack of precision [in the meaning of the word "scam"] makes the assertion "X is a scam" incapable of being proven true or false.'" (quoting *McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987))); *id.* (whether something "'is "fake" or "phony"' is similarly unprovable, since those adjectives admit of numerous interpretations'" (quoting *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 (1st Cir. 1992))).

To the extent that the Blog Post's characterization of some of the Video's content as "misleading" is susceptible to a falsity analysis, the description is substantially true.  While the Complaint describes certain elements of the Video, Compl, ¶¶ 57-79; and argues why these elements should not be viewed as misleading, *id*. ¶¶ 112-23; this approach is beside the point.  The challenged language in the Blog Post does not broadly claim that everything in the Video is "misleading and inaccurate," but rather describes the Video as "*using* misleading *or* inaccurate information."  *Id.* ¶¶ 154-55 & Ex. A at 1 (emphasis added).  For example, Project Veritas and Mr. O'Keefe promoted the Video as "undeniable video proof of *systemic* voter fraud."  *Id*. Ex. A at 1, 2 (Fig. 2) (emphasis added).  It is nothing of the kind; the Video's central "ballot harvesting" clips feature a single individual (Liban Mohammed) collecting absentee ballots for his own brother in a city council election.  *Id*. ¶¶ 59-66; Video at 0:29-1:57.  Similarly, the Video repeatedly touted itself as an exposé of a sitting U.S. congresswoman, including in its title ("Ilhan Omar Connected Cash-For-Ballots Voter Fraud Scheme Corrupts Elections") and in Mr. O'Keefe's statements in the Video that (for example) Rep. Omar "and her campaign may be behind one of the biggest voter fraud schemes in American history."  Video at 7:51-8:04.  These wild accusations are also plainly a misleading characterization of the claim of Omar Jamal, the

1  Video's other "primary on-the-record source," who says only that "I think" Liban Mohamed also

2  worked for Rep. Omar.  *Id*. at 1:57-2:04; Compl. ¶ 70.

3  ### 3.   "Debunked"

4  The Blog Post also stated (in the second sentence) that the Video "made several

5  falsifiable claims that have either been debunked by subsequent reporting or are without any

6  factual support."  Compl. ¶ 154 & Ex. A at 1.  Project Veritas does not and cannot deny that, at

7  the time of the Blog Post, the Video had already been "questioned by respected media outlets"

8  (as the Blog Post said in a passage that Project Veritas does not challenge).  *Id*. Ex. A at 3.  As

9  set forth above, *Forbes* and *Newsweek* had both described the Video as "unsubstantiated," and

10  *Fox 9 KMSP* and *Sahan Journal* had similarly questioned its lack of "hard evidence" or "solid

11  evidence."  Brand Decl. Ex. 4 at 2, Ex. 6 at 3, Ex. 8 at 1, Ex. 10 at 12.  Regardless of their

12  underlying truth, the fact that these media outlets had in fact questioned the Video prior to the

13  publication of the Blog Post is a proper subject for judicial notice.  *See* Appendix.  Even if the

14  Blog Post, in using the word "debunked," implied agreement with these earlier reports, that is a

15  matter of protected opinion.

16  ### 4.   "Without Any Factual Support"

17  A review of the Video itself makes clear that it includes "several falsifiable claims that

18  . . . are without any factual support" in the sense that they, as the Blog Post later states in an

19  unchallenged passage, "are not backed by any evidence."  Compl. Ex. A at 1, 3.  Mr. O'Keefe

20  makes several statements about Rep. Omar that he attributes only to unnamed "sources,"

21  including that her "voter fraud machine appears to be much more than just a few foot soldiers

22  like Liban Mohamed's ballot harvesting," that it "appears to be an effort that is very systemic

23  and very coordinated," and that she "is actually exploiting members of her own Somali

24  community."  Video at 12:17-12:30; 9:33-9:45.  These statements are "falsifiable" because they

25  are capable of being shown to be either true or false—*i.e.*, Rep. Omar is either engaged in voter

26

fraud in the Somali-American community or she is not.[8]  These statements are also "without factual support," or not backed by evidence, because they consist of conclusory allegations of law breaking that are premised on undisclosed statements made by unnamed individuals.

### 5.    "Coordinated Elite Disinformation Campaign"

The Blog Post also identifies the Video as a "coordinated elite disinformation campaign." Compl. ¶ 154 & Ex. A at 1.  The Blog Post clearly defines what it means by "disinformation" in the preceding sentence: "As the video calls into question the integrity of the election using misleading or inaccurate information, we determined this video to be a form of election disinformation." *Id*.  And as set forth above, the Blog Post's conclusion that the Video is misleading and thus disinformation is either non-actionable opinion or substantially true.

The phrase "elite disinformation" is also expressly defined within the Blog Post as "the key role of verified influencers in propagating the chosen narrative early on." *Id*. Ex. A at 1 (Fig. 1).  In addition, the words "elite disinformation" appear in the challenged portion of the Blog Post as an italicized and underlined hyperlink to a February 4, 2019 article in the online publication *GEN* titled "Why Fears of Fake News Are Overhyped."  Ex. 19.  This article similarly describes "elite misinformation" as "false and misleading statements made by elected officials who dominate news coverage and wield the powers of government." *Id*. at 6.  In other words, mis- or disinformation is "elite" when it is spread by those with the largest platforms—precisely what Project Veritas acknowledges is the primary focus of the Blog Post. *See* Compl. ¶ 82 ("majority of the Blog Post purported to be a technical study of whether and how prominent conservatives had worked to promote and 'aggressively spread'" the Video).

Finally, the "coordinated . . . campaign" described in the Blog Post clearly refers to the same primary discussion of "how prominent conservatives had worked to promote" the Video, not any effort by Project Veritas or others to deceive the public intentionally.  And the Complaint

---

[8] *See, e.g.*, https://www.collinsdictionary.com/us/dictionary/english/falsifiable ("designating or of a statement, theory, etc. that is so formulated as to permit empirical testing and, therefore, can be shown to be false").

1   does not dispute the Blog Post's extensive documentation of coordination to promote the Video,

2   including the pre-release communications between Mr. O'Keefe and Mike Lindell and the early

3   post-release amplification by Donald Trump Jr. and other verified "blue-check" conservative

4   influencers.  *See* Compl. Ex. A.

5   **B.      Plaintiff Does Not and Cannot Plead Fault**

6          Where the plaintiff is a public figure, the necessary degree of fault to state a defamation

7   claim under both Washington law and the First Amendment is actual malice.  *Paterson*, 502 F.

8   Supp. 2d at 1139-40 (first citing *Caruso v. Loc. Union No. 690 of Int'l Bhd. of Teamsters*, 100

9   Wn.2d 343, 352 (1983); and then citing *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496,

10  499 (1991)).  Project Veritas is plainly a public figure here because, among other things, the

11  publication of the Video "voluntarily inject[ed] [it]self . . . into a particular public controversy."

12  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).  "Actual malice means the publication

13  was made 'with knowledge it was false or with reckless disregard of whether it was false or

14  not.'"  *Paterson*, 502 F. Supp. 2d at 1143 (quoting *Sullivan*, 376 U.S. at 279-80).  It does not

15  look to "'whether a reasonably prudent man would have published, or would have investigated

16  before publishing,'" but rather whether "'the defendant ***in fact*** entertained serious doubts as to

17  the truth of [the] publication.'"  *Id*. (emphasis added) (quoting *Harris v. City of Seattle*, 315 F.

18  Supp. 2d 1105, 1110 (W.D. Wash. 2004), *aff'd*, 152 F. App'x 565 (9th Cir. 2005)).

19         Accordingly, pleading actual malice is a "'demanding burden'" that requires "specific

20  allegations of a speaker's mindset," not mere "'general allegations that a defendant should have

21  known or should have investigated the truth of his or her statements.'"  *Resolute Forest Prod.,*

22  *Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1018 (N.D. Cal. 2017) (quoting *Wynn v. Chanos*,

23  75 F. Supp. 3d 1228, 1239 (N.D. Cal. 2014)); *see also Tull v. Higgins*, No. 21-CV-01566-DMR,

24  2021 WL 6116971, at *8 (N.D. Cal. Dec. 27, 2021) (also recognizing "demanding burden");

25  *Peterson v. Gannett Co. Inc.*, No. CV-20-00106-PHX-MTL, 2020 WL 1935520, at *7 (D. Ariz.

26  Apr. 22, 2020) ("actual malice is subject to a heightened pleading standard" (citing *Iqbal*, 556

U.S. at 679)); *Miller v. Watson*, No. 3:18-CV-00562-SB, 2019 WL 1871011, at *6 (D. Or. Feb. 12, 2019) ("*Iqbal* . . . held that malice is subject to the plausibility pleading standard"), *rep. and rec. adopted*, No. 3:18-CV-00562-SB, 2019 WL 1867922 (D. Or. Apr. 25, 2019).

Project Veritas asserts that Stanford published the Blog Post "with actual malice in that [it] had knowledge that the statements were false, or [it] published the statements with reckless disregard for their truth or falsity." Compl. ¶ 166. The Complaint also offers the equally conclusory allegations that Stanford acted with actual malice because the Blog Post mischaracterizes the Video, *id*. ¶ 167; and because Stanford's policies prohibit knowingly or recklessly publishing false statements, *id*. ¶¶ 173-75. But such "[t]hreadbare recitals" of "legal conclusions" are insufficient to state any claim, *Iqbal*, 556 U.S. at 678; much less to meet the "demanding burden" of pleading actual malice. *Wynn*, 75 F. Supp. 3d at 1239. The allegations regarding Stanford's policies also fail for the separate reason that even "an extreme departure from professional standards" fails to establish actual malice. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989).

Beyond these purely conclusory assertions, Project Veritas also purports to plead actual malice based on allegations of failure to investigate, *id*. ¶¶ 168-69; failure to retract, *id*. ¶ 170; and personal and political bias, *id*. ¶¶ 171-72, 177. None suffices to state a claim. As set forth above, allegations that it would have been prudent to investigate fall short of pleading actual malice. *See Paterson*, 502 F. Supp. 2d at 1143; *Resolute*, 302 F. Supp. 3d at 1018; *Wynn*, 75 F. Supp. 3d at 1239; *see also Paterson*, 502 F. Supp. 2d at 1146 (where actual malice standard applies, speaker has "'no affirmative duty to search out the truth or to substantiate their statements, nor are they required to corroborate their sources' information'" (quoting *Herron v. Trib. Pub. Co.*, 108 Wn.2d 162, 171 (1987))). Similarly, a refusal to retract is not a specific allegation regarding a mindset of actual malice, which is judged at the time of publication. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984); *Kahl v. Bureau of Nat'l*

1    *Affs., Inc.*, 856 F.3d 106, 118 (D.C. Cir. 2017).[9]  As for bias, allegations that Stanford personnel

2    were motivated by ill will toward Project Veritas are also not indicative of whether those

3    personnel "in fact entertained serious doubts as to the truth of" the Blog Post.  *Paterson*, 502 F.

4    Supp. 2d at 1143; *see also Harte-Hanks*, 491 U.S. at 667 n.7 ("'actual malice' is unfortunately

5    confusing in that it has nothing to do with bad motive or ill will"); *Resolute*, 302 F. Supp. 3d at

6    1019 (plaintiff failed to "meet its burden of pleading actual malice with the requisite specificity"

7    because its complaint did "'not provide any specific allegations that would support a finding that

8    [the Defendants] harbored serious subjective doubts as to the validity of [their] assertions.'"

9    (quoting *Wynn*, 75 F. Supp. 3d at 1239)).

10   **VI.    PLAINTIFF DOES NOT AND CANNOT STATE A CAUSE OF ACTION FOR**

11   **DEFAMATION BASED ON THE TIMES ARTICLES**

12           Project Veritas' second cause of action alleges defamation against Stanford for

13   republication of the Blog Post in various versions of an article published by The New York

14   Times.  Compl. ¶¶ 185-212.  Project Veritas challenges the exact same language from the exact

15   same articles in the Times Action.  *Compare* Compl. ¶¶ 189, 192, 195, *with* Ex. 15 ¶¶ 186, 216,

16   246.  A defamation claim based on republication requires that the republication was foreseeable.

17   *See, e.g.,* Restatement (Second) of Torts § 576 (originator of purported defamation only liable for

18   its repetition "if he had reason to expect that it would be so repeated").  Stanford does not dispute

19   that republication of the Blog Post by The New York Times may have been foreseeable here, but

20   the only content that it "had reason to expect" to be republished was the content within the

21   original Blog Post.  Thus, Plaintiffs' republication claim fails along with its primary publication

22   claim for the reasons set forth above.

23

24

25   ───────────────
     [9] Nor could the failure to retract possibly show actual malice where that decision was made **after** other reputable
     publications had reported statements challenging the veracity of the Video made by its two "primary on-the-record
26   source[s]," Liban Oman and Omar Jamal, and reported that "the claim that Project Veritas discovered a voter fraud
     scheme connected to Rep. Ilhan Omar is FALSE."  Brand Decl. Exs. 12-14.

VII.   **PLAINTIFF DOES NOT AND CANNOT STATE A CAUSE OF ACTION FOR RESPONDEAT SUPERIOR**

Project Veritas purports to bring a separate claim for respondeat superior premised on its underlying defamation claims.  *See* Compl. ¶¶ 213-18.  However, respondeat superior is a doctrine holding that "an employer is vicariously liable to third parties for torts committed by the servant within the scope of employment," not a standalone cause of action.  *Wilcox v. Basehore*, 187 Wn.2d 772, 783 (2017).[10]  Project Veritas' third cause of action should be dismissed on this basis alone.  To the extent the Court is inclined to consider it separately for any reason, however, respondeat superior liability also plainly fails along with the other causes of action.  *See Sager v. Adamson*, No. C08-5463 FDB, 2008 WL 4181599, at *3 (W.D. Wash. Sept. 8, 2008) (citing *Orwick v. Fox*, 65 Wn. App. 71, 88 (1992)) (respondeat superior properly rejected where underlying tort claim properly dismissed).

VIII.  **CONCLUSION**

For the reasons set forth above, Stanford respectfully requests that the Court dismiss Project Veritas' Complaint against it with prejudice.

DATED this 27th day of January, 2022.

By: *s/ Brian W. Esler*

Brian W. Esler, WSBA No. 22168
Miller Nash LLP
Pier 70, 2801 Alaskan Way, Suite 300
Seattle, WA 98121
Telephone: (206) 624-8300
Email: brian.esler@millernash.com

Sarah G. Flanagan (pro hac vice)
Lee Brand (pro hac vice)
Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone: +1 415 983 1000
Email: sarah.flanagan@pillsburylaw.com
          lee.brand@pillsburylaw.com

Attorneys for Defendant Stanford

---

[10] Indeed, the Complaint's first two causes of action already seek to hold Stanford liable on a theory of respondeat superior.  *See* Compl. ¶ 183 ("Defendants are liable for the tortious actions of their employees and agents acting within the scope and course of their employment."); *id*. ¶ 211 ("Defendants are liable for the tortious actions of their employees and agents acting without [*sic*] the scope and course of their employment.").

1

CERTIFICATE OF SERVICE

2          I hereby certify that on January 27, 2022, I electronically filed the foregoing with the

3   Clerk of the Court using the CM/ECF system which will send notification of such filing to all

4   counsel of record.

5          DATED this 27th day of January, 2022.

6

7                                              s/ Brian W. Esler
                                               Brian W. Esler

8   4865-8479-2587.1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE
(Case No. 2:21-cv-01326-TSZ)