UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PROJECT VERITAS,

               Plaintiff,

   v.

LELAND STANFORD JUNIOR
UNIVERSITY; and UNIVERSITY OF
WASHINGTON,

               Defendants.

C21-1326 TSZ

ORDER

THIS MATTER comes before the Court on a Motion for Expedited Relief and Dismissal, docket no. 37, filed by Defendant Leland Stanford Junior University ("Stanford"), a Motion to Dismiss for Failure to State a Claim, docket no. 40, filed by Defendant University of Washington ("UW"), and a Motion under Rules 12(d) and 56(d), docket no. 51, filed by Plaintiff Project Veritas, to convert the motions filed by Stanford and UW to motions for summary judgment and stay adjudication of them until after the parties have conducted discovery.  Having reviewed all papers filed in support of, and in opposition to, the motions, the Court enters the following Order.

**Background**

### I.    Project Veritas

In 2011, Project Veritas was established as a not-for-profit journalism enterprise. Compl. at ¶ 23 (docket no. 1).  Project Veritas states that its "mission is to focus on investigating and exposing corruption, dishonesty, self-dealing, waste, fraud, and other misconduct in both public and private institutions to achieve a more ethical and transparent society."  Id. at ¶ 24.

On September 27, 2020, Project Veritas published a news report titled "Ilhan Omar Connected Cash-for-Ballots Voter Fraud Scheme Corrupts Elections" [hereinafter "Video Report"].  Id. at ¶ 57.  Project Veritas published the Video Report on its website and various social media and video-sharing sites.  Id. at 58.  According to Project Veritas, in the Video Report a man is engaged in "ballot harvesting" and "blatantly incriminates himself and admits to serious violations of Minnesota's election laws on behalf of his Democrat brother."  Id. at ¶¶ 61–66.  Project Veritas also contends that the video exposes other "corrupt voting activity" in Minneapolis elections.  Id. at ¶ 78.  The Video Report concludes with a call for "the Attorneys General of Minnesota and the United States to investigate these allegations."  Id. at ¶ 79.

### II.    The Election Integrity Partnership

According to Project Veritas, The Election Integrity Partnership ("EIP") "describes itself as a non-partisan coalition of research entities devoted to identifying election-related disinformation."  Compl. at ¶ 31.  Two Stanford employees started EIP by partnering with the UW Center for an Informed Public.  Id. at ¶ 32.  Project Veritas

1    asserts that "EIP's entire purpose is to try and convince the public that there is no such

2    thing as voter fraud, and that any allegations of voter fraud are right-wing propaganda

3    designed to 'suppress voting' and 'delegitimize election results without evidence.'"  Id. at

4    ¶ 34.  Project Veritas contends that EIP silences conservative voices by labeling

5    suggestions of voter fraud or improper voting activity as disinformation and by then

6    contacting social media companies to demand that they remove the disinformation.  Id. at

7    ¶ 35.

8            On September 29, 2020, two days after Project Veritas published its Video Report,

9    EIP published on its website a blog post titled "Project Veritas #BallotHarvesting

10   Amplification" [hereinafter "Blog Post"].  Id. at ¶ 81.  The opening paragraph of the Blog

11   Post stated that the Video Report "made several falsifiable claims that have either been

12   debunked by subsequent reporting or are without any factual support."  Isabella Garcia-

13   Camargo, Alex Stamos, & Elena Cryst, et al., Project Veritas #BallotHarvesting

14   Amplification, Election Integrity P'ship (Sept. 29, 2020), https://www.eipartnership.net/

15   rapid-response/project-veritas-ballotharvesting; EIP Blog Post, Ex. A to Compl. (docket

16   no. 1-1 at 2).  The opening paragraph further provided that because the Video Report

17   "calls into question the integrity of the election using misleading or inaccurate

18   information, we determined this video to be a form of election disinformation."  EIP Blog

19   Post at 2.  Project Veritas contends that EIP published the Blog Post in response to its

20   Video Report "that exposed clear evidence of illegal voting practices favoring Democrat

21   politicians in Minneapolis" and that EIP tried to discredit the Video Report "and portray

22   it as yet another example of conservative election 'disinformation.'"  Compl. at ¶ 80.

23

1    As the complaint recognizes, however, "[t]he majority of the Blog Post purported

2 to be a technical study of whether and how prominent conservatives had worked to

3 promote and 'aggressively spread' the [Video Report]." Id. at ¶ 82.  The Blog Post was

4 almost entirely focused on analyzing the "Pre-Amplification" of the Video Report prior

5 to its release and the "Early Amplification" of it upon its release by "Blue-Check

6 influencers." See EIP Blog Post at 2–7.  The Blog Post additionally contained several

7 graphs to demonstrate the role that influencers played in making the video go "viral," as

8 oppose to going viral organically, and suggested that Project Veritas might have

9 coordinated with Donald Trump, Jr. in releasing the Video Report.  Id. at 2–4 & 6.

10 Ultimately, the Blog Post reached three conclusions:  (1) different technology platforms

11 (i.e. Facebook, Twitter, etc.) took widely different actions based upon EIP's reporting of

12 the Video Report, (2) the circumstances of the release and posting of the Video Report

13 "strongly suggest the possibility of coordination between Project Veritas and official

14 members of the Trump Campaign," and (3) it should be expected that more misleading

15 videos of this type will be pushed in a similar fashion in the "coming days."  Id. at 7.

16 **III.    The New York Times Articles**

17    On the same day Project Veritas published the Video Report, The New York

18 Times published a story about President Trump's business and tax history.  Compl. at

19 ¶ 87.  Project Veritas asserts that although The New York Times expected its story to

20 cause a "huge splash," the story was "upstaged" by the Video Report.  Id. at ¶¶ 88–90.

21 Project Veritas contends that this circumstance gave The New York Times "a vested,

22 competitive interest in discrediting the [Video Report]."  Id. at ¶ 91.

23

ORDER - 4

The complaint alleges that, because the Video Report had gone viral, the EIP Blog Post authors realized they needed a large platform to try and discredit it.  Compl. at ¶ 86. Hence, Project Veritas alleges that the EIP Blog Post authors worked with The New York Times, which had its own interest in discrediting the Video Report, "to attack Project Veritas and its Video Report."  Id. at ¶ 92.  Project Veritas contends that The New York Times and EIP then conspired in publishing an article to increase the reach and visibility of the Blog Post.  Id. at ¶ 102.  According to Project Veritas, EIP knew the claims it had made in its Blog Post about the Video Report being deceptive were false at the time of publishing and nevertheless "caused" The New York Times to republish them.  Id. at ¶ 112.

On September 29, 2020, two days after Project Veritas published the Video Report and the same day EIP published the Blog Post, The New York Times published another story on its website with the headline, "Project Veritas Video Was a 'Coordinated Disinformation Campaign,' Researchers Say."  Compl. at ¶ 104; Ex. B to Compl. (docket no. 1-2).  The story described Project Veritas's Video Report as "deceptive" and referenced the conclusions in EIP's Blog Post.  Compl. at ¶ 106; Ex. B to Compl. (docket no. 1-2 at 2).  Later that day, The New York Times "published a second online story that was a slightly abbreviated version of the first," and bore the headline, "Researchers say a Project Veritas video accusing Ilhan Omar of voter fraud was a 'coordinated disinformation campaign.'"  Compl. at ¶ 107; Ex. C to Compl. (docket no. 1-3).  The New York Times published the original online story in print on September 30, 2020, with the headline, "Project Veritas Releases Misleading Video, Part of What Experts Call a

1    Coordinated Effort."  Compl. at ¶¶ 108–09; Ex. D to Compl. (docket no. 1-4).  According

2    to Project Veritas, The New York Times used the Blog Post as "pretext" to write a story

3    "to spread and amplify disinformation about [Project] Veritas's journalism in an effort to

4    advance their politically motivated narrative that illegal voting practices do not exist and

5    are merely a boogeyman created by the political right."  Id. at ¶¶ 96 & 103.

6    **IV.    The New York Litigation**

7            In New York state court, Project Veritas instituted litigation against The New

8    York Times and two of its authors for publishing five allegedly false and defamatory

9    articles in September and October 2020.  See Project Veritas v. The New York Times,

10   No. 63921/2020 (N.Y. Sup. Ct. Mar. 18, 2021) [hereinafter "NY Order"], at 1, Ex. 16 to

11   Brand Decl. (docket no. 39-16).  Three of the articles at issue in that litigation are the

12   ones published in September 2020, which Project Veritas alleges to have been the result

13   of a coordinated effort between The New York Times and EIP Blog Post authors.  See id.

14   at 2.  In that case, the defendants moved to dismiss the complaint under New York law.

15   Id. at 1.

16           In denying the motion to dismiss, the New York Court concluded that because "a

17   reasonable reader could very well believe that the challenged statements were conveying

18   facts about [Project] Veritas," the allegedly defamatory statements in the various articles

19   did not constitute opinions.  Id. at 7.  The New York Court further ruled that the

20   defendants had not proven that the reporting by Project Veritas in the Video Report is

21   deceptive and that Project Veritas had "adequately pleaded the five causes of action set

22   forth in the complaint."  Id. at 8.  Finally, while the New York Court applied New York's

23

1    recently amended anti-Strategic Lawsuit Against Public Participation ("anti-SLAPP")

2    law, it determined that Project Veritas had met its burden to demonstrate that each of its

3    causes of action had a substantial basis in law, and had demonstrated triable issues of fact

4    existed regarding actual malice.  Id. at 14–15.  The defendants then filed an interlocutory

5    appeal of the order denying their motion to dismiss, which is currently pending.  See

6    Stanford Mot. at 7 (docket no. 37); Resp. at 2 n.1 (docket no. 50).

7    **V.    The Current Litigation**

8         Project Veritas filed the complaint in this matter on September 29, 2021.  See

9    Compl.  The complaint asserts two causes of action of defamation per se for both the

10   publishing of the Blog Post by EIP and for participating in, encouraging, and ratifying the

11   subsequent republication of the Blog Post's allegedly defamatory statements in the three

12   New York Times articles.  Id. at ¶¶ 151–212.  The complaint also asserts a cause of

13   action for respondeat superior.[1]  Id. at ¶¶ 213–18.  Stanford now moves to dismiss the

14   matter pursuant to Washington's Uniform Public Expression Protection Act ("UPEPA").

15   UW has filed a motion to dismiss under Rule 12(b)(6).  The defendants also join in each

16   other's motions.  Stanford Mot. at 11 (docket no. 37); UW Mot. to Dismiss at 4 (docket

17   no. 40).

18   //

19   //

20

21

22   [1] Respondeat superior is not, however, appropriately pleaded as a standalone claim; rather, it is a theory of vicarious liability.

23

ORDER - 7

1    **Discussion**

2    **I.    Whether Washington's Uniform Public Expression Protection Act Applies**

3          The parties dispute whether Washington's anti-SLAPP statute, known as UPEPA,

4    applies in federal court.  Specifically, Project Veritas argues that under Shady Grove

5    Orthopedic Associates, P.A. v. Allstate Insurance Co., 559 U.S. 393 (2010), UPEPA does

6    not apply in federal court because it conflicts with the Federal Rules of Civil Procedure

7    ("Federal Rules").

8          UPEPA "must be broadly construed and applied to protect the exercise of the right

9    of freedom of speech and of the press."  RCW 4.105.901.  The statute provides that no

10   later than sixty days after a party is served with a complaint that asserts a cause of action

11   to which UPEPA applies, a party may file a special motion for expedited relief to dismiss

12   the cause of action or part of the cause of action.  RCW 4.105.020(2).  As is relevant

13   here, in ruling on such motion, the Court shall dismiss with prejudice a cause of action if:

14   (i) the moving party establishes that, under RCW 4.105.010(2), UPEPA applies, (ii) the

15   responding party fails to establish that, under RCW 4.105.010(3), UPEPA does not apply,

16   and (iii) the moving party establishes that the responding party fails to state a cause of

17   action upon which relief can be granted.[2]  RCW 4.105.060.

18

19   _____

20   [2] Under RCW 4.105.060, the third prong can be met via three options:  (1) the responding party fails to
     establish a prima facie case as to each essential element of the cause of action, (2) the moving party
     establishes that the responding party failed to state a cause of action upon which relief can be granted, or

21   (3) the moving party establishes that no genuine issue as to any material fact exists and the moving party
     is entitled to judgment as a matter of law on the cause of action or part of the cause of action.  Here, the
     defendants rely on only the second option—that Project Veritas has failed to state a cause of action upon

22   which relief can be granted.

23

1    In <u>Shady Grove</u>, the Supreme Court held that, when a state law conflicts with a

2    federal rule, the federal rule controls.  559 U.S. at 398.  To determine whether a state law

3    and federal rule conflict, courts first determine whether the federal rule answers the

4    question in dispute.  <u>Id.</u>  If it does, it governs unless it exceeds statutory authorization or

5    Congress's rulemaking power.  <u>Id.</u>  At issue in <u>Shady Grove</u> was a New York law that

6    precluded class action lawsuits seeking to recover a "penalty," which the Supreme Court

7    held conflicted with Federal Rule of Civil Procedure 23.  <u>Id.</u> at 397.  Accordingly, the

8    Supreme Court held that Rule 23 controlled.  <u>Id.</u> at 398–99.

9    Project Veritas cites to opinions by other federal courts of appeals, but the Ninth

10   Circuit has not expressly decided how <u>Shady Grove</u> applies to a state's anti-SLAPP

11   statute.[3]  <u>CoreCivic Inc. v. Candide Grp. LLC</u>, No. C20-3792, 2021 WL 1267259, at *3

12   (N.D. Cal. Apr. 6, 2021).  The Ninth Circuit, however, has implicitly addressed the

13   question with respect to California's anti-SLAPP statute.  <u>See</u> <u>Planned Parenthood Fed'n</u>

14   <u>of Am., Inc. v. Ctr. for Med. Progress</u>, 890 F.3d 828 (9th Cir.), <u>amended</u>, 897 F.3d 1224

15   (9th Cir. 2018).  In <u>Planned Parenthood</u>, the Ninth Circuit acknowledged that "[t]he

16   degree to which the anti-SLAPP provisions are consistent with the Federal Rules of Civil

17   Procedure has been hotly disputed." <u>Id.</u> at 833.  Although the Ninth Circuit did not

18   mention <u>Shady Grove</u> in that opinion, the Court did reference the same concepts that

19

20   _____

21   [3] Although lacking precedential weight, the Court notes that in <u>Makaeff v. Trump Univ., LLC</u>, 736 F.3d
     1180 (9th Cir. 2013), the Ninth Circuit split four-to-four when deciding whether, in the context of a
     petition for rehearing en banc, the Court should revisit its precedent regarding state anti-SLAPP statutes
22   in light of <u>Shady Grove</u>.

23

1   formed the foundation of the Supreme Court's decision in <u>Shady Grove</u>.  <u>See id.</u>; <u>see also</u>

2   <u>CoreCivic Inc.</u>, 2021 WL 1267259, at *4.  Ultimately, the <u>Planned Parenthood</u> Court held

3   that no conflict between the California anti-SLAPP statute and the Federal Rules exists

4   when courts analyze anti-SLAPP motions made on purely legal arguments under Rules 8

5   and 12.  <u>Planned Parenthood</u>, 890 F.3d at 834–35.  Since <u>Planned Parenthood</u>, the Ninth

6   Circuit has continued to hold that state anti-SLAPP statutes apply in federal court.  <u>See</u>

7   <u>Clifford v. Trump</u>, 818 F. App'x 746, 747 (9th Cir. 2020) (holding that Texas's version

8   of an anti-SLAPP law applies in federal court, and noting that "[w]e have long held that

9   analogous procedures in California's anti-SLAPP law apply in federal court"); <u>RLI Ins.</u>

10  <u>Co. v. Langan Eng'g, Env't, Surveying & Landscape Architecture, D.P.C.</u>, 834 F. App'x

11  362, 363 (9th Cir. 2021).

12          As in <u>Planned Parenthood</u>, in which the Ninth Circuit was careful to interpret the

13  California anti-SLAPP statute in a way that avoided collision with the Federal Rules, the

14  Court here construes UPEPA in a manner that does not create a conflict.  UPEPA

15  essentially mimics the language of Rule 12(b)(6) in stating the standards for courts to use

16  when analyzing a special motion for expedited relief to dismiss based on only the legal

17  sufficiency of the complaint.  <u>Compare</u> RCW 4.105.060(1)(c)(ii)(A) (permitting

18  dismissal when "[t]he moving party establishes that the responding party failed to state a

19  cause of action upon which relief can be granted") <u>with</u> Fed. R. Civ. P. 12(b)(6)

20  (allowing a party to assert as a defense "failure to state a claim upon which relief can be

21  granted").  The Court concludes that UPEPA applies in federal court and will analyze

22

23

Stanford's UPEPA motion, and the motion to dismiss filed by UW, under the standards of Rule 12(b)(6).

Alternatively, Project Veritas argues that, even if UPEPA applies in federal court, UW is excluded from its scope. UPEPA does not apply to a cause of action asserted "[a]gainst a governmental unit or an employee or agent of a governmental unit acting or purporting to act in an official capacity." RCW 4.105.010(3)(a)(i). UW does not dispute that it is a governmental unit or that the UW personnel who co-authored and co-published the Blog Post did so in their official capacities. See UW Mot. to Dismiss at 4–6 (docket no. 40). Instead, UW gives policy reasons as to why a governmental unit and its agents should fall within the scope of UPEPA's protections. See id. But the Court cannot ignore the plain language of the statute. The Court concludes, as a matter of law, that UW may not assert UPEPA in this case. To the extent UW moves under UPEPA, which it has done by joining in Stanford's motion under the statute, see UW Mot. at 4, UW's motion is DENIED. Project Veritas does not dispute that, assuming UPEPA applies, Stanford falls within its scope and may assert it. Thus, the Court will address Stanford's motion under UPEPA, but only as it relates to Stanford.

## II.    Legal Standard Applicable to Motion to Dismiss

In their joint reply, docket no. 56, Stanford and UW assert that both their motions should be evaluated under Rule 12(b)(6). Although a complaint challenged by a Rule 12(b)(6) motion to dismiss need not provide detailed factual allegations, it must offer "more than labels and conclusions" and contain more than a "formulaic recitation of the elements of a cause of action." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

ORDER - 11

1   (2007).  The complaint must indicate more than mere speculation of a right to relief.  Id.

2   When a complaint fails to adequately state a claim, such deficiency should be "exposed at

3   the point of minimum expenditure of time and money by the parties and the court."  Id. at

4   558.  A complaint may be lacking for one of two reasons:  (i) absence of a cognizable

5   legal theory, or (ii) insufficient facts under a cognizable legal claim.  Robertson v. Dean

6   Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984).  In ruling on a motion to

7   dismiss, the Court must assume the truth of the plaintiff's allegations and draw all

8   reasonable inferences in the plaintiff's favor.  Usher v. City of Los Angeles, 828 F.2d

9   556, 561 (9th Cir. 1987).  The question for the Court is whether the facts in the complaint

10  sufficiently state a "plausible" ground for relief.  Twombly, 550 U.S. at 570.  If the Court

11  considers matters outside the complaint, it must convert the motion into one for summary

12  judgment. Fed. R. Civ. P. 12(d).  If the Court dismisses the complaint or portions

13  thereof, it must consider whether to grant leave to amend.  Lopez v. Smith, 203 F.3d

14  1122, 1130 (9th Cir. 2000).

15  **III.   Judicial Notice**

16         Before turning to the merits of the defendants' motions, the Court addresses the

17  defendants' request for the Court to take judicial notice of nineteen publicly available

18  documents including blog posts, news articles, websites, and legal filings.  See Stanford

19  Mot. at 11 (docket no. 37); App. (docket no. 38); UW Mot. at 3 n.2 (joining Stanford's

20  request for judicial notice).  Project Veritas disputes only whether the Court may take

21  judicial notice of Exhibits 4–14 attached to, and the hyperlinks in Paragraph 21 of, the

22  Declaration of Lee Brand, docket no. 39.  See Mot. under Rule 12(d) at 2 n.1 (docket no.

23

1   51).  In reaching its decision on the pending motions to dismiss, however, the Court has

2   considered only Exhibits 15 and 16, which are, respectively, the complaint Project

3   Veritas filed in New York and the NY Order, and which are not in dispute.[4]  Although

4   the Court believes it could take judicial notice of the exhibits at issue, not for their truth,

5   but as indicative of what was in the public realm, see Von Saher v. Norton Simon

6   Museum of Art at Pasadena, 592 F.3d 954, 960 (9th Cir. 2010), the Court did not

7   consider any of the disputed materials when making its ruling.  Accordingly, the Court

8   need not address whether it would be proper to take judicial notice of the disputed

9   exhibits or hyperlinks.

10           In its Motion under Rules 12(d) and 56(d), docket no. 51, Project Veritas asks that,

11   if the Court takes judicial notice of any of the disputed exhibits, it convert the motions

12   filed by Stanford and UW to motions for summary judgment and delay ruling on them

13   until after Project Veritas has had an opportunity to conduct discovery.  Because the

14   Court did not take judicial notice of any of the disputed exhibits, Project Veritas's request

15   is moot, and the Court will not convert the motions, docket nos. 37 and 40, to motions for

16   summary judgment.  Project Veritas's motion, docket no. 51, is DENIED as moot.

17   //

18   //

19

20   ─────────────────

[4] The Court also reviewed the Video Report, the Blog Post, and the three New York Times articles at
21   issue in this case, which are all referenced in the complaint and, with the exception of the Video Report,
     are attached to the complaint as exhibits. See Exs. A–D (docket nos. 1-1, 1-2, 1-3, & 1-4). Neither party
22   has argued that the Court should not consider these articles or exhibits when addressing the pending
     motions.

23

ORDER - 13

**IV.   Motions brought by Stanford and UW**

     **a.   Defamation Per Se for Publication of the Blog Post**

Project Veritas's first cause of action is for defamation per se for publication of the Blog Post.  Compl. at ¶¶ 151–84.  To state a claim for defamation in Washington, a plaintiff must plead four elements:  (1) a false statement, (2) publication, (3) fault, and (4) damages.[5]  Duc Tan v. Le, 177 Wn.2d 649, 662, 300 P.3d 356 (2013).  Defendants assert that Project Veritas failed to adequately plead the first and third elements.

As to the first element, truth is an absolute defense to a defamation claim. Paterson v. Little, Brown & Co., 502 F. Supp. 2d 1124, 1133 (W.D. Wash. 2007).  To establish a defense of truth, "a defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the 'sting,' is true." Id. (quoting Camer v. Seattle Post-Intelligencer, 45 Wn. App. 29, 38, 723 P.2d 1195 (1986) (affirming a grant of summary judgment in favor of the defendant concerning a story referring to the plaintiffs as "nuisance suers")).  The defendant need not prove the literal truth of every claimed defamatory statement.  Id.

---

[5] If a plaintiff shows the statements were sufficiently injurious to constitute defamation per se, damages are assumed, and the plaintiff need not prove actual damages.  Maison de Fr., Ltd. v. Mais Oui!, Inc., 126 Wn. App. 34, 44, 108 P.3d 787 (2005).  "A publication is defamatory per se (actionable without proof of special damages) if it '(1) exposes a living person to hatred, contempt, ridicule or obloquy, to deprive him [or her] of the benefit of public confidence or social intercourse, or (2) injures him [or her] in his [or her] business, trade, profession or office."  Life Designs Ranch, Inc. v. Sommer, 191 Wn. App. 320, 328, 364 P.3d 129 (2015) (quoting Caruso v. Local Union No. 690, 100 Wn.2d 343, 353, 670 P.2d 240 (1983)).  Because, as discussed below, the Court determines that the statements at issue are nonactionable opinions, and therefore not defamatory, the Court need not address whether Project Veritas has adequately pleaded the elements of a claim for defamation per se.

Expressions of opinion are protected under the First Amendment and therefore are not actionable.  Id.  Accordingly, before the Court may assess the truth or falsity of an alleged defamatory statement, the Court must first determine whether the statements at issue were intended as statements of fact or expressions of opinion.  Id. Courts consider the totality of circumstances surrounding a statement when analyzing whether it should be taken as a statement of fact or as an opinion.  Id. at 1134.  "The Court should consider, at a minimum, the medium and context, the audience, and whether the statement implies 'undisclosed facts.'"  Id. (quoting Robel v. Roundup Corp., 148 Wn.2d 35, 55–56, 59 P.3d 611 (2002)).  "When determining whether an article is defamatory, a court considers it as a whole and construes it by its ordinary meaning to a person reading it."  Seaquist v. Caldier, 8 Wn. App. 2d 556, 566, 438 P.3d 606 (2019). Whether a statement constitutes fact or opinion is a question of law for the court.  Camer, 45 Wn. App. at 39.

Out of the entire six-page post, Project Veritas points to only a few phrases from the Blog Post's opening paragraph as being "false and defamatory," which the Court has bolded below:

> On Sunday night, a right-wing activist group, Project Veritas, released a video alleging illegal ballot harvesting in Minnesota.  **The video made several falsifiable claims that have either been debunked by subsequent reporting or are without any factual support**.  As the video calls into question the integrity of the election **using misleading or inaccurate information, we determined this video to be a form of election disinformation**.  While we have reported our findings to the relevant online

platforms, this video stands as an interesting example of what a domestic, **coordinated _elite disinformation_ campaign** looks like in the United States.

EIP Blog Post (docket no. 1-1 at 2) (emphasis added); Compl. at ¶ 154.  Project Veritas alleges that the phrases were false and "create[d] the false impression that Project Veritas published a misleading and inaccurate video news report about illegal ballot harvesting in Minnesota without any factual support that was intended to deceive the public."  Compl. at ¶¶ 155 & 157.  Although the complaint explicitly alleges that the statements in the Blog Post were false, dismissal of this cause of action is appropriate if the statements constitute nonactionable opinions.

Viewing the totality of the circumstances, the Court concludes that the phrases in the Blog Post that Project Veritas challenges as defamatory are nonactionable opinions. In considering the medium and context, "statements of opinion are expected to be found more often in certain contexts, such as editorial pages or political debates."  Dunlap v. Wayne, 105 Wn.2d 529, 539, 716 P.2d 842 (1986).  Here, the statements regard whether claims of election fraud were based on misleading or inaccurate information.  Throughout the 2020 presidential election, statements regarding election fraud often resulted in heated and emotional discussions.  See Camer, 45 Wn. App. at 41 (determining that an article about issues resulting in heated and often emotional discussions constituted nonactionable opinion).  This context suggests that the Blog Post is providing opinions.

Additionally, "[t]he court should consider the entire communication and note whether the speaker qualified the defamatory statement with cautionary 'terms of apparency.'"  Life Designs Ranch, 191 Wn. App. at 331 (quoting Dunlap, 105 Wn.2d at

ORDER - 16

539).  Project Veritas challenges only a couple phrases of the Blog Post as defamatory

and agrees that the majority of the Blog Post "purported to be a technical study of

whether and how prominent conservatives had worked to promote and 'aggressively

spread' the [Video Report]."  Compl. at ¶ 82.  Indeed, the Blog Post focuses on

describing when posts about the Video Report were made on social media, who made

them, and how influencers strategically worked to gain visibility for the Video Report.

See EIP Blog Post.  Thus, not only were the allegedly defamatory portions of the Blog

Post an exceedingly small piece of the Blog Post, they also did not relate to the main

subject of the Blog Post.  That Project Veritas fails to take issue with the Blog Post as a

whole, and instead cherry picks just a couple phrases as defamatory, does not weigh in its

favor.  Furthermore, EIP qualified one of the challenged statements by saying that *it had

determined* that the Video Report was part of a disinformation campaign.  This language

constituted a "term of apparency" and signaled to the reader that the statement was one of

opinion rather than fact.  See Life Designs Ranch, 191 Wn. App. at 331.

The specific words used in the Blog Post were also indicative of them being

opinions because they are incapable of defamatory meaning.  Words that have imprecise

meaning are incapable of being defamatory because they are not provably false.

Paterson, 502 F. Supp. 2d at 1134–35.  Courts have found phrases like "rip-off," "fraud,"

and "unethical" are nonactionable because of their imprecise meaning and because they

are susceptible to many interpretations.  See id. at 1135 & n.2.  In this case, one cannot

determine the truth or falsity for the phrases that Project Veritas alleges to be defamatory.

For example, the statement that the Video Report is "misleading" or constitutes

1   "disinformation" is capable of many interpretations and thus cannot be proven true or

2   false.  See Phantom Touring, Inc v. Affiliated Publ'ns, 953 F.2d 724, 728 n.7 (1st Cir.

3   1992) ("Even the less figurative assertion that appellants are 'blatantly misleading the

4   public," . . . is subjective and imprecise, and therefore not capable of verification or

5   refutation by means of objective proof.").  The statement that the Video Report had been

6   "debunked" is similarly incapable of being proven true or false.

7       "In the context of ongoing public debates, the audience is prepared for

8   mischaracterizations and exaggerations, and is likely to view such representations with an

9   awareness of the subjective biases of the speaker."  Dunlap, 105 Wn.2d at 539 (internal

10  citation omitted).  Again, the statements made in the Blog Post are in the context of a

11  political debate on whether rampant election fraud exists in America.  Given this context,

12  readers of the Blog Post were prepared for the authors to be giving their opinion about

13  election fraud.

14      The complaint alleges that while the EIP "describes itself as a non-partisan

15  coalition of research entities," it is really "a partisan effort masquerading as an academic

16  one" that is funded and was founded by people with clear democratic-party preferences.

17  Compl. at ¶¶ 31 & 36–38.  A reasonable inference to be drawn from the complaint is that

18  readers of the EIP Blog Post would have had some awareness of the allegedly left-leaning

19  biases of the authors.  Unfortunately, "[p]olitical mudslinging is expected by audiences

20  during contentious elections."  Seaquist, 8 Wn. App. 2d at 567.  Given that the Blog Post

21  was made in the context of a hotly debated political topic, readers would have been

22

23

1   expected to approach the article with the same caution about the authors' subjective

2   biases as any other political article.

3        The Court next considers whether the statement implies an undisclosed fact.  A

4   court's consideration of "[t]he third factor is 'perhaps the most crucial' as 'arguments for

5   actionability disappear when the audience members know the facts underlying an

6   assertion and can judge the truthfulness of the allegedly defamatory statements

7   themselves.'" Life Designs Ranch, 191 Wn. App. at 332 (quoting Dunlap, 105 Wn.2d at

8   539–40); see also Duc Tan, 177 Wn.2d at 664 ("When the audience knows the facts

9   underlying an opinion and can judge the truthfulness of the allegedly defamatory

10  statement themselves, the basis for liability for the opinion is undercut.").  Thus, "[w]hen

11  a publisher makes a qualified or unqualified assertion of fact based on true information

12  supplied to the public or equally available to the public," the statement constitutes a

13  nonactionable opinion.  Dunlap, 105 Wn.2d at 540 (internal citation omitted).

14       The statements in the Blog Post that the Video Report "made several falsifiable

15  claims that have either been debunked by subsequent reporting or are without any factual

16  support," used "misleading or inaccurate information," and  constituted a "coordinated

17  elite disinformation campaign" do not imply any undisclosed fact.  Readers of the Blog

18  Post could watch the Video Report for themselves to see if they found the Video Report's

19  claims to be accurate or misleading.  Similarly, readers could conduct their own research

20  and find the publicly available articles on which EIP relied in making the statement that

21

22

23

1   the Video Report's claims had been debunked.  Indeed, Project Veritas does not dispute

2   that the Video Report and subsequent articles about it were all publicly available.

3       Project Veritas cites <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1 (1990), to argue

4   that even statements couched as opinions may be actionable if they imply an assertion of

5   fact about the plaintiff.  Resp. at 25 (docket no. 50).  In <u>Milkovich</u>, the Supreme Court

6   denied the existence of a "wholesale defamation exemption for anything that might be

7   labeled 'opinion.'"  497 U.S. at 18.  The Supreme Court then explained that to receive

8   full constitutional protection, a statement of opinion relating to matters of public concern

9   cannot contain a provable false factual connotation.  <u>Id.</u> at 20.  The Supreme Court

10   explained this distinction by way of example:

> [A] statement on matters of public concern must be provable as false before
> there can be liability under state defamation law, at least in situations, like
> the present, where a media defendant is involved.  Thus, unlike the statement,
> "In my opinion Mayor Jones is a liar," the statement, "In my opinion Mayor
> Jones shows his abysmal ignorance by accepting the teachings of Marx and
> Lenin," would not be actionable.

<u>Id.</u>

    The statements in the Blog Post are closer to the nonactionable example given by

the Supreme Court in <u>Milkovich</u>.  The Blog Post did not merely say that Project Veritas's

Video Report was false, but instead stated that EIP had determined the Video Report was

a form of election disinformation because the claims made in it had been debunked, used

misleading or inaccurate information, or lacked factual support.  Although Project Veritas

argues that the terms "debunked," "misleading," and "without factual support" are

capable of being proven true or false, the Court disagrees.  These phrases are susceptible

1  to many interpretations.  What one may find misleading another may find accurate.

2  Indeed, the parties in this case disagree over whether the Video Report was misleading or

3  had sufficient factual support.

4        The Court recognizes that the New York Court might have reached a different

5  conclusion in part.  See NY Order at 7 (docket no. 39-16).  Although the New York

6  litigation concerned additional articles that are not at issue here, both suits involve the

7  three New York Times articles at issue in Project Veritas's second cause of action.

8  Whether the New York Court found that the language in these three articles referencing

9  EIP's Blog Post constituted nonactionable opinions is, however, unclear.  For example,

10 the New York Court stated the following regarding the citation to the Blog Post by The

11 New York Times:

> 12     For instance, in defendant Astor's article dated September 29, 2020, she
> 13     spends the majority of the article merely describing the [Video Report], and
>     speaks to the conclusions of researchers at Stanford University and the
> 14     University of Washington, and others.  There, Astor obviously reports on the
>     findings of these groups, and throughout the article they are properly cited.
> 15     However, the source of the following statement is unclear, or if it is fact or
>     opinion that: "Mr. O'Keefe and Project Veritas have a long history of
> 16     releasing manipulated or selectively edited footage purporting to show illegal
>     conduct by Democrats and liberal groups."

17 NY Order at 6 (citations omitted).  With regard to a different article not at issue here, the

18 New York court held that defendants "[s]tating that the video is 'deceptive' and stating

19 'without verifiable evidence' in a factual way in a news article certainly presents the

20

21

22

23

ORDER - 21

statement as fact, not opinion."[6]  Id. at 7.  Ultimately, the New York Court did not

explicitly address whether the Blog Post phrases at issue were opinions.[7]

### b.    Defamation Per Se for Republication of Defamatory Statements by The New York Times

Project Veritas also alleges in the second cause of action that defendants

"participated in, encouraged, and ratified the subsequent republication of the defamatory

statements in the EIP Blog Post by The New York Times."  Compl. at ¶ 186.

Specifically, the complaint asserts defendants are liable for defamation based on language

in the New York Times articles that the Video Report was "deceptive," was "probably

part of a coordinated disinformation effort, according to researchers at Stanford

University and the University of Washington," and was "[m]aking claims without

evidence of ballot harvesting."  Id. at ¶¶ 189, 192, & 195, see also Exs. B–C to Compl.

(docket nos. 1-2, 1-3, & 1-4).  In responding to the pending motions to dismiss, Plaintiff

Veritas reiterates that its second cause of action is based on republication of the same

statements from the Blog Post, or statements that have the same "gist" as those in the

Blog Post, on which it bases its first cause of action.  Because the Court determines that

---

[6] The parties have represented that in the New York litigation, the defendants appealed the New York Court's decision, and the case is still pending before the Appellate Division.  Thus, any resolution of these issues must await appellate review.

[7] The opinion of the New York Court is distinguishable because it applied New York law, whereas here the Court applies Washington law.  Thus, while this Court is required to construe the Blog Post by its ordinary meaning to a person reading it, see Seaquist, 8 Wn. App. 2d at 566, the New York Court had to assess "whether a reasonable listener or reader could have concluded that the statements were conveying facts about the plaintiff."  NY Order at 4 (citation omitted).  Since the New York Court was analyzing whether the articles at issue were actionable under the laws of another state and applying a different standard, the NY Order is not persuasive authority for the determination this Court must make, and it does not alter the Court's conclusions that the phrases at issue here constitute nonactionable opinions.

1   the original statements in the Blog Post constituted nonactionable opinions and were not

2   defamatory, the Court also concludes that the republication of those statements in the

3   New York Times articles was not defamatory because they constituted nonactionable

4   opinions.

5       For these reasons, the Court determines that the allegedly defamatory statements

6   are nonactionable opinions and that both of Project Veritas's defamation per se claims

7   fail as a matter of law.  Because the statements that were in the Blog Post and that were

8   republished in the New York Times articles are not actionable as a matter of law, leave to

9   amend would be futile.  See Lopez, 203 F.3d at 1130.  Accordingly, the Court

10  DISMISSES the case with prejudice and without leave to amend.

11  **Conclusion**

12      For the foregoing reasons, the Court ORDERS:

13      (1)     The Motion under Rules 12(d) and 56(d), docket no. 51, filed by Project

14  Veritas, is DENIED.

15      (2)     The Motion to Dismiss, docket no. 40, filed by UW, and joined by

16  Stanford, is GRANTED, and this case is DISMISSED with prejudice and without leave

17  to amend.

18      (3)     The Motion for Special Expedited Relief under UPEPA, docket no. 37,

19  filed by Stanford, is GRANTED.  UW's Motion under UPEPA, which UW made by

20  joining in Stanford's motion, is DENIED.

21      (4)     Any motion by Stanford for attorney fees under UPEPA must be filed

22  within thirty (30) days of the date of this Order.

23

ORDER - 23

1    (5)    The Clerk is directed to enter judgment consistent with this Order, to send a

2    copy of this Order and the judgment to all counsel of record, and to CLOSE this case.

3    IT IS SO ORDERED.

4    Dated this 17th day of May, 2022.

5

6    _____
     Thomas S. Zilly
     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23